SUBSURFCO, INC., a Nebraska Corporation, Plaintiff and Appellant,

v.

B-Y WATER DISTRICT, a Water User District Organized pursuant to SDCL 46-16, Defendant, Counterclaimant and Appellee,

v.

SEABOARD SURETY COMPANY, a New York Corporation, Defendant and Appellant.

No. 13679.

Supreme Court of South Dakota.

Argued Feb. 14, 1983.

Decided Aug. 10, 1983.

Francis M. Smith of Woods, Fuller, Shultz & Smith, Sioux Falls, R. James Zieser, Tyndall, Gerald M. Kraai of Margolin & Kirwan, Kansas City, Mo., for appellants.

Thomas E. Alberts of Engel & Alberts, Avon, Robert C. Ulrich, Vermillion, for defendant, counterclaimant and appellee.

DOBBERPUHL, Circuit Judge.

## PROCEDURAL HISTORY

Subsurfco, Inc. (Contractor) commenced this action to recover the value of materials and services it supplied to the B–Y Water District (B–Y) pursuant to a written contract for the construction of a distribution piping system for B–Y. B–Y counterclaimed against Contractor for completion costs, liquidated damages and water used by Contractor. By way of third party complaint, B–Y claimed the same damages from Seaboard Surety Company (Surety) on its performance bond. The case was tried to a jury. A jury verdict in the sum of $2,740,702.93 was rendered against Contractor on B–Y's counterclaim and against Surety on B–Y's cross-claim. A judgment in that amount, less $729,264.60 representing the unpaid balance of the contract price (without adjustment for work in place), or a net judgment of $2,011,438.33 was entered by the court against Contractor and Surety (appellants). Appellants appeal from that judgment. We affirm in part, reverse in part and remand.

## FACTS

On October 11, 1978, Contractor and B–Y entered into a written contract for the construction of Division I of Phase II of B–Y Rural Water System for $5,627,210.50. Division I consists of water distribution lines, shutoff valves, control valves and appurtenant work required to distribute potable water to approximately eleven hundred rural users and five towns in southeastern South Dakota. Division I was divided into

three sections for construction purposes, with approximately 614 miles of pipeline contained in all three sections.

Peter Johnson, of Johnson Engineering Company, designed and prepared the specifications and drawings of Division I. The contract defines "ENGINEER" as "[t]he person, firm or corporation named as such in the CONTRACT DOCUMENTS." No one is named as such in the contract, although the term "ENGINEER" is frequently used therein. The status of Peter Johnson or Johnson Engineering Company with respect to the project is unclear. B–Y and Johnson Engineering executed a contract which set forth the duties of Johnson Engineering. For the purpose of determining such status, appellants offered this contract in evidence, but the court refused to admit the contract after an offer of proof was made.

The B–Y inspectors observed all aspects of the pipeline operation, including the bedding, backfilling, compaction, joining of pipe, deflections, and the depth to which the pipe was laid. With a few minor exceptions, no work was rejected by the "engineer" or inspectors at the time it was performed.

During construction on the project, a total of 20 payments were made by B–Y to Contractor. Each payment was approved by B–Y, Johnson Engineering, and the Farmers Home Administration and was based upon and contained the certificate of the B–Y Project Coordinator.

Contractor began construction on October 11, 1978, starting with the construction of the asbestos cement (AC) pipeline in Section 1. The AC pipeline consists of approximately 25 miles of pipe with various diameter sizes ranging from 18 inches to 10 inches and serves as the main water line through which all three sections of Phase II of Division I are served. The 25 miles of AC pipeline in Section 1 together with a portion of the polyvinyl/chloride (PVC) pipeline in Section 1 did not pass pressure tests.

Beginning in April, 1980, portions of the AC pipeline in Section 1 exploded, blew out, loosened and leaked.

While Contractor was attempting to remedy the construction defects existing on the AC pipeline, it proceeded to lay the remaining PVC pipelines in Sections 1, 2 and 3. Portions of the PVC pipelines failed to pass pressure tests.

On May 5, 1980, the other Divisions of Phase II had been completed by other contractors, including the water treatment plant, and were ready for operation.

In the summer of 1980, after the time had expired for the work to be completed, Contractor informed the water district board that they were unable to complete the project and that such inability was the result of a defective design. Contractor alleged that Johnson Engineering had failed or neglected to properly provide for adequate air-relief valves in his plans and specifications and, as a result of this defect, the pipeline was not serviceable.

Throughout the summer and fall of 1980, Contractor, one year after the date specified for completion, was still attempting to repair the numerous leaks existing on the AC line that had failed to pass pressure tests as of that time.

In the late summer and fall of 1980, Contractor had appeared before the board on various occasions and informed them that they were having problems with the AC line. On December 10, 1980, Contractor informed the board that they no longer knew what to do with the AC line and suggested to the board that the line be turned on and put into service and that the leaks be repaired as they surfaced. The board refused to accept this recommendation of Contractor.

On January 9, 1981, B–Y notified Contractor that it intended to terminate Contractor's services on the project and subsequently terminated Contractor's services on January 29, 1981. Thereafter, B–Y removed one and one-half miles of the 18-inch diameter AC pipeline and relaid it. Sections 2 and 3 were then turned on in May, 1981, and since then have been serving water to customers.

The jury determined that B–Y was entitled to a verdict against appellants. In reaching this verdict, the jury specifically found that the design of the system was not defective; that Contractor was not prevented from completely performing the terms of the contract by the actions of B–Y; that Contractor's services were rightfully terminated by B–Y; that Contractor materially breached the contracts; and that Johnson Engineering acted in good faith in determining the damages incurred to B–Y regarding the AC pipeline and warranty work to be completed.

## ISSUES

### I.

WERE DETERMINATIONS AND ESTIMATES OF DAMAGE BY THE "ENGINEER" CONCLUSIVE DETERMINATIONS OF B–Y'S DAMAGES OR "COSTS INCURRED" SUBJECT ONLY TO A FINDING THAT SUCH DETERMINATIONS AND ESTIMATES WERE NOT MADE IN GOOD FAITH? THE TRIAL COURT HELD THESE DETERMINATIONS AND ESTIMATES TO BE CONCLUSIVE, AND WE REVERSE.

### II.

DID B–Y RECOVER AN IMPROPER MEASURE OF DAMAGES CONTRARY TO THE DIMINUTION IN VALUE RULE AND SDCL 21–1–3 AND 21–1–5? THE TRIAL COURT HELD THE RECOVERY WAS NOT IMPROPER, AND WE REVERSE.

### III.

SHOULD THE ISSUE OF B–Y'S WAIVER OF CONSTRUCTION DEFECTS HAVE BEEN SUBMITTED TO THE JURY? THE TRIAL COURT REFUSED TO SUBMIT THE ISSUE TO THE JURY, AND WE REVERSE.

### IV.

SHOULD THE JURY HAVE BEEN ALLOWED TO CONSIDER TESTIMONY OR EVIDENCE PRESENTED IN RELATION TO ACTS OR OMISSIONS BY B–Y INSPECTORS OR ENGINEERS REGARDLESS OF THE CONTRACT? THE TRIAL COURT HELD THE JURY WAS NOT ENTITLED TO CONSIDER TESTIMONY OR EVIDENCE, AND WE REVERSE.

### V.

WERE THE WRITTEN CONTRACT BETWEEN JOHNSON ENGINEERING AND B–Y AND THE LETTER, WHICH DESCRIBED THE DUTIES AND AUTHORITY OF JOHNSON ENGINEERING, ADMISSIBLE REGARDING THE DUTIES AND AUTHORITY OF JOHNSON ENGINEERING AND B–Y? THE TRIAL COURT HELD THE EXHIBITS WERE NOT ADMISSIBLE, AND WE REVERSE.

### VI.

DID B–Y'S TERMINATION OF CONTRACTOR CONSTITUTE AN ABROGATION WAIVER OR ELECTION REQUIRING DENIAL OF B–Y'S CLAIM FOR LIQUIDATED DAMAGES? THE TRIAL COURT HELD IT DID NOT, AND WE REVERSE.

### VII.

WERE EXHIBITS REGARDING DAMAGES PROPERLY ADMITTED INTO EVIDENCE? THE TRIAL COURT ADMITTED THE EXHIBITS, AND WE AFFIRM.

### VIII.

SHOULD THE $46,524.57 DUE CONTRACTOR FOR WORK IN PLACE HAVE BEEN INCLUDED IN THE UNPAID BALANCE OF THE CONTRACT PRICE FOR THE PURPOSE OF DETERMINING THE AMOUNT PAYABLE UNDER THE CONTRACT? THE TRIAL COURT HELD THIS AMOUNT SHOULD NOT BE INCLUDED, AND WE REVERSE.

## IX.

WERE EIGHT OF THE JURY INSTRUCTIONS IMPROPER AND PREJUDICIAL? THE TRIAL COURT GAVE THOSE INSTRUCTIONS, AND WE AFFIRM IN PART AND REVERSE IN PART.

### DECISION

#### I.

■ Appellants contend it was error to instruct the jury that the determinations and estimates of the damage by the "engineer" under the contract were conclusive determinations of B–Y's damages or "costs incurred" subject only to a finding that such determinations were not made in good faith. We agree.

General Condition (GC) 18.2 of the contract provides:

> If the CONTRACTOR ... violates any provision of the CONTRACT DOCUMENTS, the OWNER may ... terminate the services of the CONTRACTOR and take possession of the PROJECT ... and finish the WORK by whatever method he may deem expedient.... If the unpaid balance of the CONTRACT PRICE exceeds the direct and indirect costs of completing the PROJECT, including compensation for additional professional services, such excess shall be paid to the CONTRACTOR. If such costs exceed such unpaid balance, the CONTRACTOR will pay the difference to the OWNER. Such costs incurred by the OWNER will be determined by the ENGINEER and incorporated in a CHANGE ORDER.

The trial court directed the jury to find damages in favor of B–Y in the amount determined by the "engineer" if the "engineer" acted in good faith in making that determination.

We hold that the trial court erred in giving the instructions regarding conclusive determination of damages or costs incurred because the parties did not intend to give the "engineer" the power to make such determinations and the Johnson Engineer-

ing estimates were not a determination of "costs incurred" under the contract.

■ Contract clauses that provide that the amount, classification, sufficiency, completion, etc., of work done under a building or construction contract by the contractor, shall be determined by an architect, engineer, superintendent, or other person, are valid, and will be sustained. But to make such a certificate or decision conclusive requires plain language in the contract. It is not to be implied. Annot., 110 A.L.R. 137 (1937) supplementing Annot., 54 A.L.R. 1255 (1928). This rule is stated and exemplified in two recent South Dakota cases. In *Brezina Constr. Co. v. South Dakota Dep't of Transp.,* 297 N.W.2d 168, 169 n. 1 (S.D.1980), the contract provided, "All authorized roadway and drainage excavation will be either rock excavation or unclassified excavation. Authority to identify and define the physical characteristics which determine final classification shall be vested solely in the Engineer." In *Kyburz v. State,* 79 S.D. 114, 116, 108 N.W.2d 645, 646 (1961), the contract stated, "The State Engineer estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided."

In each case, the State contended that the determinations of its engineer were binding and conclusive. In those cases this court stated:

> The rule appears to be well established that parties to a building or construction contract may designate an engineer or other person to determine the questions related to its execution and that the parties are bound by [the] determination of matters within the scope of [that] authority and when made in good faith.

*Brezina, supra,* 297 N.W.2d at 169–70; *Kyburz, supra,* 79 S.D. at 117, 108 N.W.2d at 647.

Both *Kyburz* and *Brezina* involved contracts which expressly vested either final or sole authority in the engineer. No such language is contained in the instant contract.

In this case the "engineer" was not named in the contract. Although Johnson

Engineering prepared the plans and specifications, it did not have inspection responsibilities on the job. The contract duties and functions of the "engineer" were performed by others, including B–Y personnel.

The court instructed the jury that the determinations of the "engineer" with regard to B–Y's damages were conclusive if such determinations were made in good faith. Because the "engineer" was not given final and conclusive authority to determine the damages under the contract, the jury instructions were in error.

The contract actually placed final and binding authority elsewhere. GC 30 provides:

> 30.1 All claims, disputes and other matters in question arising out of, or relating to, the CONTRACT DOCUMENTS or the breach thereof ... shall be decided by arbitration ... The award rendered by the arbitrators shall be final, and judgment may be entered upon it in ·any court having jurisdiction thereof.
>
> 30.2 ... Demand for arbitration shall in no event be made after institution of legal proceedings based on any claim, dispute or other matter in question....

B–Y contends that the arbitration feature of GC 30 was extinguished by the commencement of this suit. We do not agree. The contract provides that final resolution of all disputes under the contract shall be either by arbitration or litigation, and makes the filing of suit by one party before arbitration the determinative factor as to which resolution is to be final. GC 30 indicates that the parties did not intend for the "engineer" to be final arbiter or make final, conclusive determinations.

It is also clear that the estimates of Johnson Engineering were not a determination of "costs incurred" under the contract. Upon termination, the owner may finish the work, and the contractor is not to receive further payment until the work is finished. The amount payable to either party is then determined by netting the unpaid balance of the contract price and the "costs of completing the project." GC 18.2 states in part,

"Such costs incurred by the OWNER will be determined by the ENGINEER and incorporated in a CHANGE ORDER." By trial time, practically no completion work had been done. Over $2,500,000 worth of asserted damages were based upon estimates prepared by Peter Johnson. There was no testimony that B–Y had decided or even intended to proceed with the completion work estimated by Peter Johnson. Furthermore, the contract itself makes it clear that "costs incurred" refer to an accomplished fact, not an estimate or opinion as to what might be done or how much it might cost to do so.

The court's instructions directed the jury to accept the opinions and estimates of cost of completion by the "engineer" if the "engineer" acted in good faith. From a liberal and practical construction of GC 18.2, it is clear that that condition becomes operative in a situation where the contractor has been terminated, the project has been completed by the owner, and "costs incurred" are primarily a matter of records and calculation.

For the above reasons, we hold that it was error to instruct the jury that the determinations and estimates of damage of the "engineer" under the contract were conclusive determinations of B–Y's damages or "costs incurred" subject only to a finding that such determinations were not made in good faith.

## II.

Appellants argue that B–Y recovered an improper measure of damages contrary to the diminution in value rule and SDCL 21–1–3 and 21–1–5. We agree.

The contract called for the construction of approximately 614 miles of pipeline at a bid price of $5,627,210.50. Only 37 miles of pipeline are at issue in this case, that consisting of about 25 miles of AC line and 12 miles of shallow 8 inch and 10 inch PVC line. No defect was claimed in the PVC line other than that its depth averages five feet two inches rather than the six feet required by the contract. The balance of

the dispute related to the 25 miles of AC pipeline that had not passed pressure tests.

 This court has set forth the appropriate measure of recovery by stating, "[W]here the defects cannot be remedied without reconstruction of a substantial portion of the work, the measure of damage is the difference in value between what it would have been if built according to contract and what was actually built." *Northern Farm Supply, Inc. v. Sprecher*, 307 N.W.2d 870, 873 (S.D.1981), *quoting Dobler v. Malloy*, 214 N.W.2d 510, 518 (N.D.1973). *See also, H.P. Droher and Sons v. Toushin*, 250 Minn. 490, 85 N.W.2d 273 (1957). In the case before us, the record reflects that the defects cannot be remedied without reconstruction of a substantial portion of the work.

Appellants also contend that the verdict for B–Y's damages was unreasonable, unconscionable and grossly oppressive in violation of SDCL 21–1–3[1] and that B–Y recovered a greater amount in damages for breach of contract than it could have gained by full performance of the contract, in violation of SDCL 21–1–5.[2] B–Y recovered damages totalling 49% of the bid price of the entire contract and almost a million dollars more than the price bid for the material and installation of the pipe in question. Additionally, on the part of the line that B–Y actually relaid, it reused 97% of the pipe, 78% of the couplings, and 68% of the gaskets.

Therefore, we hold that B–Y recovered an improper measure of damages contrary to the diminution in value rule and SDCL 21–1–3 and 21–1–5.

### III.

 Appellants contend that the issue of B–Y's waiver of construction defects should have been submitted to the jury. We agree.

A review of the record indicates that B–Y had employee-inspectors present during construction who observed all aspects of the pipeline operation. Additionally, under the contract the "engineer" certifies substantial completion, may furnish additional instructions to the Contractor, may require uncovering of work for inspection, may make changes in the details of the work by issuing field orders, may reject work for failure to comply with the contract, determines costs incurred for completing the project, approves payments to the Contractor, acts as the owner's representative during construction, shall reject any materials not meeting specifications, shall approve testing equipment and procedure, directs locations of the pipeline, may make changes in location of air release valves, shall stake location of all pipelines and appurtenances and directs the use of special bedding material for the pipeline. No written field orders were issued by the inspectors or Peter Johnson.

Furthermore, twenty payments were made to Contractor from 1978 to late 1980. Each payment was approved by B–Y, Johnson Engineering and Farmers Home Administration. Each payment was based upon and contained the certificate of the B–Y project coordinator, which stated, "I hereby certify that I have carefully inspected the work and as a result of my inspection and to the best of my knowledge and belief, the quantities shown in this estimate are correct and the work has been performed in accordance with the contract documents."

The trial court refused appellants' proposed jury instruction regarding waiver and

1. SDCL 21–1–3 provides:
 Damages must in all cases be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered.

2. SDCL 21–1–5 provides:

Notwithstanding the provisions of these statutes, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides, except in the cases specified in statutes providing exemplary damages or penal damages, and in statutes relating to damages for breach of promise to marry, for seduction, or wrongful injuries to animals.

refused to permit appellants to amend their pleadings to conform to the evidence with regard to the issue of waiver.

The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and with full knowledge of the material facts, does or forbears the doing of something inconsistent with the exercise of the right. To support the defense of waiver there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right. *Babcock v. McKee,* 70 S.D. 442, 18 N.W.2d 750 (1945). Appellants rely upon *Reif v. Smith,* 319 N.W.2d 815, 817 (S.D.1982), involving a construction contract which stated:

> Section 15. Work shall be changed and contract price and completion shall be modified only as set out in written change order. Any adjustment in the contract price resulting in a credit or a charge to the owner shall be determined by mutual agreement of the parties or by arbitration before starting the work involved in the change.

In *Reif,* the owners repeatedly visited the construction site and were aware of problems created by the plans and the changes. None of the changes or additions were made pursuant to written change orders as specified in section 15. This court held as follows with regard to section 15:

> Such provisions, however, are impliedly waived by the owner where he has knowledge of the change, fails to object to the change, and other circumstances exist which negate the provision; i.e., the builder expects additional payment, the alteration was an unforeseen necessity or obvious, subsequent oral agreement, or it was ordered or authorized by the owner....
>
> Additionally, repeated or entire disregard for contract provisions will operate as a waiver of section 15....
>
> It is incongruous that the owner, author of the contract with the written change order requirement, can come into court and acknowledge that he authorized

the changes without a single written change order, admit liability for two or three specific items, but escape liability on the balance of the assertion that he understood that they were "tit for tat." We hold that the trial court erred in finding in effect that Smiths [owners] had only partly waived section 15.

*Id.* at 817.

B–Y claims, *inter alia,* that GC 7.5 clearly indicates that B–Y did not waive its rights regarding the construction defects. GC 7.5 states:

> Neither observations by the ENGINEER nor inspections, tests or approvals by persons other than the CONTRACTOR shall relieve the CONTRACTOR from his obligations to perform the WORK in accordance with the requirements of the CONTRACT DOCUMENTS.

We are of the opinion that GC 7.5 grants B–Y a right that it has waived.

B–Y cites *Kansas City Bridge Co. v. State,* 61 S.D. 580, 250 N.W. 343 (1933), for the proposition that B–Y personnel or Johnson Engineering could not waive construction defects or otherwise derogate from the provisions of the contract. *Kansas City Bridge Co.* should be compared with the later case of *Northern Improvement Co., Inc. v. South Dakota State Highway Commission,* 267 N.W.2d 208 (S.D.1978), which held that absent a waiver by defendant of the requirement that claims for extra work be in writing, the plaintiff has no claim under the contract for extra compensation for extra work. In addition, *Kansas City Bridge Co.* involved a claim for extra work, and the rule was followed that a public body cannot be exposed to additional expense by waiver in such case by an unauthorized engineer-employee.

Therefore, we hold that it was error for the court to refuse appellants' proposed jury instruction regarding waiver and to refuse to permit appellants to amend their pleadings to conform to the evidence with regard to the issue of waiver.

## IV.

█ In a closely related issue to that waiver, appellants further argue that the jury should have been allowed to consider testimony or evidence presented in relation to acts or omissions by B–Y inspectors or engineers regardless of the contract. We agree.

The court's instruction to the jury in question quoted GC 7.5, *quoted supra* under issue III, and informed the jury that GC 7.5 was clear and unambiguous. The instruction then stated that Contractor and B–Y are bound by this contract provision and the jury was directed to apply the clear meaning and intent of this contract provision. The instruction then directed the jury not to consider any testimony or evidence that had been presented in relation to any acts or omissions on behalf of B–Y inspectors or engineers which would alter or change the meaning of this contract stipulation.

In view of our decision that the issue of B–Y's waiver of construction defects should have been submitted to the jury, it follows that the jury should consider any testimony or evidence relating to any acts or omissions on behalf of B–Y which would alter or change the meaning of GC 7.5. Therefore, it was error for the court to give the jury instruction in question.

## V.

█ Appellants next contend the written contract between Johnson Engineering and B–Y and the letter, which described the duties and authority of Johnson Engineering, were admissible. We agree.

After an offer of proof, the trial court refused to admit the contract, which set forth and limited the duties of Johnson Engineering. The contract also provided that Johnson Engineering was to provide resident construction inspection for the project unless B–Y notified Johnson Engineering in writing that B–Y would provide such inspection. Johnson Engineering did not perform resident construction inspection. Although no such written notice was given, B–Y did provide such inspection on the job. The letter from Johnson Engineer-

ing to Subsurfco explains Johnson's authority and duties.

█ B–Y responds by citing the parol or extrinsic evidence rule. Parol or extrinsic evidence will not be admitted to vary the terms of a written instrument or to add to or detract from the writing, but when the writing is uncertain or ambiguous, such evidence is admissible to explain the instrument. *Jensen Pure Plant Food Int'l, Ltd.,* 274 N.W.2d 261 (S.D.1979); *Christiansen v. Strand,* 81 S.D. 187, 132 N.W.2d 386 (1965). "A contract is ambiguous when, after application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty exists as to which of two or more meanings is the proper one." *Jensen, supra,* at 264. *Boyer v. Iowa High School Athletic Ass'n,* 260 Iowa 1061, 1069, 152 N.W.2d 293, 298 (1967). *And see Piechowski v. Case,* 255 N.W.2d 72 (S.D.1977).

We conclude that the contract between B–Y and Subsurfco was ambiguous. Both exhibits were offered to show the authority of the "engineer" and Johnson Engineering under GC 18.2 and GC 7.5. The exhibits also bore directly on the identity of the "engineer" referred to in both GC 18.2 and GC 7.5. Therefore, the court should have admitted the exhibits to clarify the contract terms.

## VI.

█ Appellants claim that B–Y's termination of contractor constituted an abrogation, waiver or election requiring denial of B–Y's claim for liquidated damages. We agree.

B–Y claimed both cost of completion or "damages" under GC 18.2 and liquidated damages under GC 15 and Special Condition (SC) 5. The court's instructions permitted an award of liquidated damages, and liquidated damages were awarded in the sum of $203,526.00.

█ When an owner terminates a contract, the cost of completion is recoverable; the liquidated damages are not recoverable. *United States v. American Surety Co.,* 322

U.S. 96, 64 S.Ct. 866, 88 L.Ed. 1158 (1944). A similar holding was made in *United States v. Maryland Casualty Co.*, 25 F.Supp. 778, 780 (D.Me.1938), in which the court stated:

> The Government protected itself under the contract in two different ways. It could take over the work and complete it, charging any extra cost and expense to the contractors; or it could wait until the job should be completed by the contrac- tors, then collect as liquidated damages the per diem amount agreed upon. It could not adopt both courses. The two methods are inconsistent. The Govern- ment has chosen the first one, taking the work out of the hands of the contractors who cannot now complete it.

Thus, B–Y's claim for liquidated damages shall be stricken.

### VII.

■ Appellants argue that exhibits re- garding damages should not have been ad- mitted into evidence because they were not supported by sufficient foundation, con- tained estimates of damages not clearly as- certainable in nature and origin, were not confined to "costs incurred" as required by the contract, contained improper items of damages or costs of completion, and con- tained estimates not determined as of the time of breach. We disagree.

A detailed review of appellants' specific objections would not be useful. The record indicates that B–Y laid a proper foundation for the exhibits in question. Additionally, the damages were ascertainable in both their nature and origin as required by SDCL 21–2–1 and contained proper items as damages or costs of completion. Finally, the estimates contained in the exhibits were determined in accordance with GC 18.2 in that the estimates reflect B–Y's costs to complete the project rather than estimates determined as of the time of breach.

### VIII.

■ Appellants argue the $46,524.57 due the Contractor for work in place should have been included in the unpaid balance of the contract price for the purpose of deter- mining the amount payable under GC 18.2. We agree.

The last payment made to Contractor was on pay certificate No. 20. The amount set forth in certificate 20 shows an amount "Due Contractor to Date" which includes $46,524.57 for work in place. This amount was for work based upon actual, although approximate, measurement.

B–Y asserts that this amount should not be included in the unpaid balance of the contract price because it represents extra work and it had not been added to the contract price by change order. The con- tract between B–Y and Contractor was a unit price contract. The final amounts due were to be determined by actual quantities installed. Here, Contractor installed the quantities in question and these quantities were not extra work. Adjustments on unit price contracts are normally made at the end of the job. In this case, due to B–Y's termination of Contractor, the end of the job was not reached and a change order was impossible. Because the $46,524.57 is an unpaid amount for work actually installed, that amount should have been included in the unpaid balance of the contract price.

Therefore, the jury instruction that stat- ed this amount was in dispute should not have been given.

### IX.

Finally, appellants contend eight other jury instructions should not have been giv- en because they were improper and prejudi- cial. We hold that one of the eight jury instructions in question is improper.

■ Instruction 19 stated that altera- tions or extras must be ordered by a change order and that there could be no recovery in the absence of a change order. In light of our holding that Contractor is entitled to $46,524.57 for work in place that did not constitute extra work even though there was no change order, Instruction 19, there- fore, should be omitted.

After reviewing the seven other jury in- structions in question, we hold that the jury

instructions taken as a whole properly instructed the jury. This holding does not affect the decisions regarding the jury instructions addressed in the previous issues.

The judgment of the circuit court is affirmed in part, reversed and remanded in part.

WOLLMAN and DUNN, JJ., and MILLER, Circuit Judge, concur.

MORGAN, J., concurs in part and dissents in part.

DOBBERPUHL, Circuit Judge, sitting for FOSHEIM, C.J., disqualified.

MILLER, Circuit Judge, sitting for HENDERSON, J., disqualified.

MORGAN, Justice (concurring in part, dissenting in part).

I dissent on Issue VII with respect to admissibility of certain exhibits in support of damages. In my view, this conflicts with the holding on Issue II, that the proper measure of damages applicable is diminution of value.

I concur in the balance of the opinion.