#28580-a-JMK
**2020 S.D. 19**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

EXCEL UNDERGROUND, INC.,                     Plaintiff and Appellee,

v.

BRANT LAKE SANITARY DISTRICT,          Defendant and Appellant.

--------------------------------------------------------------------------------------------------------------------

BRANT LAKE SANITARY DISTRICT,          Plaintiff and Appellant,

v.

EXCEL UNDERGROUND, INC. &
GRANITE RE, INC.,                                      Defendants and Appellees,

and

GRANITE RE, INC.,                                      Third-Party Plaintiff and
                                                                        Appellee,

v.

REED I. OLSON & MELISSA D.
FISCHER-OLSON,                                       Third-Party Defendants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE PATRICK T. PARDY
Judge

\* \* \* \*

ARGUED
FEBRUARY 20, 2019
OPINION FILED **04/01/20**

ELIZABETH S. HERTZ
VINCE M. ROCHE of
Davenport, Evans, Hurwitz
    & Smith, LLP
Sioux Falls, South Dakota

HEATHER M. LAMMERS BOGARD of
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
Rapid City, South Dakota

JEROME B. LAMMERS of
Lammers Kleibacker, LLP
Madison, South Dakota                    Attorneys for appellants.


DANIEL K. BRENDTRO
Sioux Falls, South Dakota                Attorney for appellee
                                                Excel Underground, Inc.


JOSEPH A. NILAN
DAVID H. GREGERSON of
Gregerson, Rosow, Johnson
    & Nilan, LTD
Minneapolis, Minnesota

WILLIAM P. FULLER of
Fuller & Williamson, LLP
Sioux Falls, South Dakota                Attorneys for appellee
                                                Granite Re, Inc.


GREGORY WHEELER of
Boyce Law Firm, LLP
Sioux Falls, South Dakota                Attorneys for appellee
                                                Schmitz Kalda & Associates.


TODD MEIERHENRY of
Meierhenry & Sargent, LLP
Sioux Falls, South Dakota                Attorneys for amicus curiae
                                                Dakota Homestead Title
                                                Insurance Company and South
                                                Dakota Conservancy District.

#28580

KERN, Justice

[¶1.] In 2012, the Brant Lake Sanitary District (the District) contracted with Schmitz, Kalda, and Associates, Inc. (SKA) to engineer a sewer system and with Excel Underground, Inc. (Excel) to install it. After lengthy delays, the District terminated Excel's contract, and Excel and the District sued each other for breach of contract. The District also sued Excel's surety, Granite Re, Inc. (Granite). In response, Granite filed a third-party complaint for contribution, reimbursement, or indemnity against the owners of Excel—Reed Olson and Melissa D. Fischer-Olson. Additionally, the District filed a third-party complaint against SKA for contribution and indemnity.

[¶2.] Prior to trial, the court granted Excel's motion to dismiss the District's claim for liquidated damages. The court also granted SKA's motion for summary judgment on the District's third-party complaint against it and dismissed SKA from the suit. However, the court denied the District's motion for summary judgment against Excel, and their claims against each other proceeded to a jury trial.

[¶3.] At the close of the evidence and over the District's objection, the circuit court instructed the jury that SKA served as the District's agent. The court also instructed the jury regarding the District's statutory emergency bidding procedures. The jury returned a verdict in favor of Excel, and the District unsuccessfully moved for judgment notwithstanding the verdict or in the alternative, a new trial. The District appeals. We affirm.

-1-

## Facts and Procedural History

[¶4.]     The District is a public entity incorporated under the laws of the State of South Dakota.  In 2012, the District decided to install a wastewater collection system (the Project) for residents near Chester, South Dakota, to replace individual septic tanks for approximately 200 homes and cabins located around Brant Lake.  This low-pressure system was designed to take waste from each residence by a gravity sewer pipe to an individual grinder pump to process the waste into slurry for piping to a main line.

[¶5.]     The Project required installation of two main-line branches surrounding the Lake.  The branches were designed to join into a single line on the west side of the Lake, which would then drain into a sewage lagoon.  To avoid disturbing the ground surface, the plans called for most of the piping to be installed using "directional boring" rather than open trenching.  The District employed SKA to engineer the Project and awarded Excel, the lowest bidder, the installation contract.  Granite issued a performance bond as a surety for Excel's work.  Reed Olson, owner of Excel, and his wife Melissa Fischer-Olson, executed a general agreement of indemnity, in which they agreed to hold Granite harmless for any loss as a result of the bond.

[¶6.]     Excel's contract began on May 30, 2012.  The parties agreed to a December 30, 2012 deadline for substantial completion and a May 30, 2013 deadline for final completion.  The contract included a liquidated damages clause, which, by its terms, attempted to anticipate the District's damages if Excel delayed completion of the Project beyond the agreed-upon dates.  Further, the contract

provided that in the event of a delay, the District could hire a third party to complete the Project and recover the cost of completion from Excel.

[¶7.]     The District issued a notice to proceed with construction on June 25, 2012. Delays in the construction schedule occurred almost immediately due to difficult terrain and the late arrival of critical supplies. Excel's president, Reed Olson, sent a letter to the District expressing concerns about Excel's ability to meet the December 30, 2012 substantial completion date. He requested an extension until May 31, 2013, with remaining cleanup to be completed in June. The District denied this request. As construction continued, the parties disagreed regarding change orders, payment schedules, Excel's duty to supply troubleshooting services, and the Project's price. For example, changes in the construction plans—specifically, the need to use open trenching around the residences in an area called Spawn's Addition rather than proceeding with directional boring—contributed to the increased costs and delay. Issues also arose regarding selection of the proper hydraulic pressure testing formula for HDPE[1] pressure sewer pipelines after installation to ensure its proper performance.

[¶8.]     As the project moved towards completion, Excel sent a letter to the District requesting that it send a punch list of uncompleted contract items.[2] The District did not send the list. In early January 2014, dozens of grinder stations

---

1.     HDPE pipe is a flexible plastic pipe often used to transfer fluids or gas.

2.     A punch list is an itemized list of final work or repairs necessary to complete a job. *City of Bridgewater v. Morris, Inc.*, 1999 S.D. 64, ¶ 2, 594 N.W.2d 712, 714.

began freezing. Excel, the District, and the grinder pump supplier disputed which business was responsible for troubleshooting services. Although the District allowed Excel to continue working on the Project until January 20, 2014, it ultimately gave Excel notice that it was terminating the contract because Excel had failed to meet the Project deadlines and requirements. Five days later, the District hired a replacement contractor to troubleshoot, inspect, and repair malfunctioning grinder pumps.

[¶9.] On January 19, 2014, Excel sued the District for breach of contract in Minnehaha County, alleging the District violated the express terms of the agreement and the implied duty of good faith and fair dealing. The complaint also named the supplier and manufacturer of the grinder pumps as defendants. In a separate action commenced in Lake County on February 20, 2014, the District brought suit against Excel and Granite for breach of contract. It requested, in part, liquidated and compensatory damages related to the completion of the contract. In response, Granite filed a third-party complaint against Reed Olson and Melissa D. Fischer-Olson seeking indemnification if the District succeeded in its claims.

[¶10.] Excel's Minnehaha County action was transferred to Lake County, and the cases were consolidated. On March 5, 2014, the District declared the unfinished Project an emergency on the basis that it posed a threat to public health. By doing so, it was permitted to bypass the standard bidding procedures required of a public entity. On March 20, 2014, the District instructed its engineer, SKA, to obtain proposals from replacement contractors by April 2, 2014. However, when the District held its April 2, 2014 meeting, SKA was still soliciting bids. Five weeks

later, on May 7, the District had one bidder and expected another by the end of the week. On May 22, SKA informed the District that two companies had submitted bids for the Project. That same day, the District hired Dakota Road Builders (DRB), the lowest bidder, to finish the Project. The new sewage system was not completed until fall 2015. In May 2014, the District notified Granite that it was making a claim against Excel's bond. In that letter, the District contended that Excel failed to supply skilled workers and equipment during performance of the Project, failed to timely pay subcontractors, and disregarded SKA's authority.

[¶11.] The pre-trial proceedings involved extensive discovery, including several motion hearings.[3] In April 2016, the District filed a third-party complaint against SKA seeking indemnification and contribution for any liability due and owing as a result of Excel's suit. Excel moved for partial summary judgment seeking dismissal of the District's claim for liquidated damages, which the court granted, concluding that the District elected compensatory damages when it terminated Excel's contract.

[¶12.] As trial approached, the court set a filing deadline for further dispositive motions. SKA moved for summary judgment, seeking dismissal of the District's third-party complaint because neither the District nor Excel could prove SKA's conduct caused delays in the Project's completion. SKA argued that Excel's expert witness, Michael Carr, could not state that trenching delayed the completion of the Project. Moreover, SKA contended that Excel failed to produce documents

---

3. As the case progressed, the pump manufacturer and the supplier of the grinder pumps were dismissed from the lawsuit as a result of a settlement.

supporting its request for an increase in compensation for trenching. Further, SKA alleged it promptly modified the pipe testing standard upon Excel's written request,[4] and Excel did not produce evidence of damages related to the pipe testing standards.

[¶13.] Rather than oppose the motion, the District admitted nearly all of SKA's material facts. According to the District, the facts asserted by SKA in its affidavits were consistent with the District's theory of the case against Excel. However, the District argued that if summary judgment was granted to SKA, Excel should be precluded from seeking damages against the District for the undisputed material facts referenced in the motion—namely, that the delays caused by the hydraulic pressure testing requirements and trenching in Spawn's Addition contributed to Excel's damages. This was because, in the District's view, an order granting summary judgment to SKA necessarily deemed SKA's facts undisputed. Although Excel was not a party to the motion, it filed a brief resisting SKA's motion, arguing that there were genuine issues of material fact.

[¶14.] The circuit court issued an order granting SKA summary judgment and dismissing SKA from the lawsuit on December 12, 2017, primarily because the District did not oppose it. The District responded by moving for summary judgment against Excel on December 22, 2017, relying on the court's conclusion that the material facts asserted by SKA were undisputed. At a January 8, 2018 hearing, the

---

4. At trial, Excel ultimately recovered $37,200 in damages relating to the incorrect pressure testing formula on the theory that the formula generated "false positives" on dozens of occasions, causing Excel to chase leaks that did not exist.

court denied the District's request for summary judgment. It reasoned that Excel was not bound by the facts asserted in support of SKA's summary judgment motion against the District because that motion resolved only the third-party complaint (between the District and SKA) and not the original complaint (between Excel and the District). Additionally, the court found the motion untimely because the District did not move for summary judgment until nearly two months after the court's pre-trial motion deadline.

[¶15.] A nine-day jury trial began in January 2018. During trial, Excel and Granite introduced evidence of delays associated with the hydraulic pressure testing and trenching in Spawn's Addition. Excel and Granite also presented evidence regarding the District's competitive bidding procedures to support its claim that the District failed to mitigate its damages by not timely hiring a replacement contractor.

[¶16.] At the close of the evidence, the circuit court instructed the jury that SKA acted as the District's agent. Additionally, because the District hired a contractor to complete the project without submitting the matter for public bids, the court also gave an instruction on the public emergency exception to the standard bidding procedures ordinarily required of a public entity. The court deemed the instruction relevant to the District's duty to mitigate its damages.

[¶17.] The jury rejected the District's claim for damages in the amount of $794,763.56 and instead returned a verdict of $1,569,691.81 in favor of Excel. This sum included $285,921.81 for retainage or compensation for completed work, $483,770 for other payments due under the contract, and $800,000 for lost profits.

[¶18.] The District requested a new trial or in the alternative, judgment as a matter of law. Among other assertions of error, the District argued that the circuit court erred in instructing the jury regarding agency and emergency bidding practices, which prejudiced the District. It also challenged the verdict as excessive and contrary to law. The circuit court denied the motion.

[¶19.] The District appeals, raising several issues for our review that we restate as follows:

> I. Whether the circuit court erred by dismissing the District's claim for liquidated damages.
>
> II. Whether the circuit court's dismissal of the District's third-party complaint required the court to dismiss Excel's claims against the District.
>
> III. Whether the circuit court erred by instructing the jury that SKA was the District's agent.
>
> IV. Whether the circuit court erred by allowing testimony regarding the District's emergency bidding procedures and instructing the jury on the same.
>
> V. Whether the evidence was sufficient to support the jury's damage award.

The South Dakota Conservancy District (SDCD) and Dakota Homestead Title Insurance Company (DH) jointly filed an amicus curiae brief supporting the District's position.[5]

---

5. SDCD finances sewer and water projects for many political subdivisions throughout the state and financed this Project for the District, and DH financed the remaining costs of completion after the District terminated Excel from the Project.

## Analysis and Decision

### I.  Whether the circuit court erred by dismissing the District's claim for liquidated damages.

[¶20.]    Even though the District chose to terminate Excel's contract, a decision it recognizes forecloses its pursuit of liquidated damages under our current law, the District contends that it was still entitled to pursue both liquidated and compensatory damages because the terms of its contract provide for both.[6]  The circuit court dismissed the District's claim for liquidated damages because it considered itself bound by our holding in *Subsurfco, Inc. v. B-Y Water Dist.*, 337 N.W.2d 448 (S.D. 1983).

[¶21.]    In *Subsurfco*, a jury returned a verdict that awarded both actual and liquidated damages for breach of contract.  *Id.* at 457–58.  We reversed on appeal, explaining that when facing injury for breach of contract, a party can "protect itself under the contract in two different ways."  *Id.* at 458.  These options include "tak[ing] over the work and complet[ing] it, charging any extra cost and expense to the contractors" or "wait[ing] until the job should be completed [and] then collect[ing] as liquidated damages the per diem amount agreed upon."  *Id.*  We explained that these remedies are distinct; therefore, "[w]hen an owner terminates a contract, the cost of completion is recoverable; the liquidated damages are not recoverable."  *Id.* at 457.

---

6.    The District's contract with Excel contained a provision for liquidated damages, requiring Excel to pay the District $1,450 per day for failing to meet the Project's deadlines.  Under this provision, the District argued Excel owed it $559,700.  If the District terminated Excel's services, the contract also provided that the District could recover the cost of completing the contract without affecting any other right the District had against Excel.

[¶22.]    The District requests that we relax our holding in *Subsurfco* to allow an injured party to pursue liquidated damages even when it chooses to terminate a contract.[7]  For support, it relies on case law emerging in other jurisdictions that allows owners to sue contractors for liquidated damages "for a reasonable time after abandonment by the contractor or termination by the owner." *Weitz Co. v. MacKenzie House, LLC*, 665 F.3d 970, 977 (8th Cir. 2012) (applying Missouri Law). *See also* 24 Williston on Contracts § 65:20 (4th ed. 2019) ("[T]he majority now construe [liquidated damages clauses] as applying . . . not only to the period of time during which the performance of the contractor is delayed prior to abandonment, but to whatever period is required to complete the work.").

[¶23.]    Additionally, the District contends liquidated damages are proper when, as in the present case, the contract in dispute does not limit the type of damages available.[8]  If allowed to pursue liquidated damages, the District submits that it will not recover twice for the same injury because "actual damages related to the cost of completion are separate and distinct from liquidated damages intended to compensate for injury resulting from delay." *A. Miner Contracting, Inc. v. Toho–*

---

7.    The District, in analyzing the cases cited in *Subsurfco*, argues that *United States v. American Surety Co.*, 322 U.S. 96, 98 n.3, 64 S. Ct. 866, 868 n.3, 88 L. Ed. 1158 (1944) does not stand for the general proposition announced by *Subsurfco*.  The District also questions our reliance on *United States v. Maryland Casualty Co.*, 25 F. Supp. 778, 780 (D.Me. 1938) because it relied on early Twentieth Century cases that do not reflect the changing trend with regard to liquidated damages clauses.

8.    Section 17.2 of the contract provides that if Excel violates the contract, the District, "*without prejudice to any other right or remedy,* [could] terminate the services of CONTRACTOR . . . and finish the Work by whatever method he may deem expedient . . . ." (Emphasis added.)

*Tolani Cty. Improvement Dist.*, 311 P.3d 1062, 1071 (Ariz. Ct. App. 2013). Even if the damages are not distinct, the District argues that it is only requesting the right to elect its remedy at trial.

[¶24.] Given the situation presented here, however, we need not revisit *Subsurfco*. After a nine-day trial, the jury rejected the District's breach of contract claim in its entirety. It found that Excel was entitled to contract damages in the amount of $1,569,691.81, and after calculation of prejudgment interest, a total judgment of $2,026,483.39. In light of the jury's rejection of the District's claims, the District would not have recovered liquidated damages from Excel even if our law permitted it. The circuit court did not err by dismissing the District's claim for liquidated damages.

> **II.     Whether the circuit court's dismissal of the District's third-party complaint required the court to dismiss Excel's claims against the District.**

[¶25.] Next, the parties dispute whether the circuit court's entry of summary judgment dismissing the District's third-party complaint against SKA had any collateral impact on Excel's claims as the first-party plaintiff. The circuit court gave two reasons for refusing to extend the summary judgment order to claims alleged in the original complaint. First, it concluded that the District made a tactical "decision not to file for summary judgment" against Excel within the deadline for dispositive motions, instead filing its motion after resolution of SKA's motion. Second, the court concluded that, as a matter of law, third-party motions did not impact claims asserted in the original complaint.

[¶26.] On appeal, the District concedes that it failed to file a motion for summary judgment against Excel by the deadline for dispositive motions. Nevertheless, the District argues it timely requested summary judgment on Excel's claims because the District asked for summary judgment in a brief it filed in response to SKA's summary judgment motion. The District further contends its motion was timely because it made an oral request for summary judgment against Excel during SKA's summary judgment motion hearing and was informed by the court that it would defer judgment because the issue was not yet ripe. Finally, the District argues that in all fairness, a court should be permitted to enforce summary judgment against *all* parties whether directly involved in the motion or not. To conclude otherwise, it claims, would mean it could not oppose SKA's motion without admitting liability to Excel.

[¶27.] For support, the District urges us to apply the logic of *Precision Erecting, Inc. v. M & I Marshall & Ilsley Bank, G.A.P., Inc.*, a decision from the Wisconsin Court of Appeals. 592 N.W.2d 5 (Wis. Ct. App. 1998). In that case, the court held that when a party does not defend against a summary judgment motion, if fundamentally fair, a court is permitted to enforce the judgment against all parties, including those not directly involved with the motion. *Id.* at 12. The court counseled that in multi-party litigation, the parties must carefully examine their exposure when any party moves for summary judgment regardless of whether the motion is directed at them. *See id.*

[¶28.] Granite and Excel argue that adopting a rule that binds non-parties to motions not directed at them would cause unnecessary resistance to summary

judgment motions and encourage collusion and gamesmanship. Additionally, Excel points to the plain language of our summary judgment rule (SDCL 15-6-56(c)) and to rules governing judgments upon multiple claims or involving multiple parties (SDCL 15-4-54(b)) for support.

[¶29.] We decline to apply the reasoning in *Precision Erecting* because the language of our rules does not contemplate mandatory responses from parties not named in motions. SDCL 15-6-56(b) states a party may move "for summary judgment in *his* favor . . .." (Emphasis added.) It contains no language expanding the obligation to respond to all parties in the lawsuit whether they are named in the motion or not. Excel did not assert a claim against SKA. Further, SKA only moved for summary judgment under SDCL 15-6-56(b) on the third-party complaint filed against it by the District. As such, Excel was not a party to the summary judgment motion and was not bound by the rule to respond. To hold otherwise, as Granite succinctly stated, would allow parties "to engage in friendly motion practice and unilaterally exonerate themselves from liability without ever having to direct a motion against the party claiming damages." The circuit court properly refused to extend its summary judgment ruling to Excel's claims against the District.

[¶30.] Limiting enforcement of summary judgment motions to named parties does not, as the District suggests, manifest an unfair result on this record. When SKA moved for summary judgment against the District, the District could have filed a motion for summary judgment against Excel. Instead, the District filed its motion after the court's ruling on SKA's deadline for dispositive motions. The circuit court determined that "[t]actically, [the District] made a decision" not to file

a motion for summary judgment against Excel at the same time that SKA filed its summary judgment motion. We conclude that the circuit court did not abuse its discretion or err in declining to hear the motion. *Jopling v. Jopling*, 526 N.W.2d 712, 715 n.4 (S.D. 1995) ("Only when an abuse of discretion is shown is a court's scheduling decision reversed.").[9]

### III. Whether the circuit court erred by instructing the jury that SKA was the District's agent.

[¶31.] The District also argues that the circuit court erred by instructing the jury, over the District's objection, that SKA acted as the District's agent. We review a circuit court's "decision to grant or deny a particular instruction under the abuse of discretion standard." *Vetter v. Cam Wal Elec. Coop., Inc.*, 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615. While a circuit court "has discretion in the wording and arrangement of its jury instructions," courts do not have "discretion to give incorrect, misleading, conflicting, or confusing instructions . . . ." *Papke v. Harbert*, 2007 S.D. 87, ¶ 13, 738 N.W.2d 510, 515. "[T]o do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial." *Vetter*, 2006 S.D. 21, ¶ 10, 711 N.W.2d at 615.

[¶32.] An erroneous instruction is prejudicial if "in all probability [it] produced some effect upon the jury's verdict and [was] harmful to the substantial rights of a party." *Id.* Therefore, "[w]hether a jury was properly instructed overall [is] a question of law reviewable de novo." *Id.* Under this standard, "we construe

---

9. Based on our review of the record and the circuit court's subsequent rulings, we think it doubtful that the circuit court would have granted a timely summary judgment motion in favor of the District.

jury instructions as a whole to learn if they provided a full and correct statement of the law." *Id.*

[¶33.]     On the issue of agency, the court instructed the jury as follows:

> Instruction 18: Schmitz Kalda & Associates, Inc., and its employees were the agent of Brant Lake Sanitary District before, during and after the Phase 2 Contract. Therefore, any act or omission of Schmitz Kalda or its employees, at that time[,] is considered the act or omission of Brant Lake Sanitary District.

The District argues that the circuit court erred because SKA was referred to in the underlying documents as an independent contractor rather than its agent. The error, according to the District, prejudiced the District because the court's instruction wrongly interjected the tort principle of vicarious liability into this case. The District highlights that during trial, Excel and Granite pointed to SKA's deficiencies during the performance of the contract rather than the District's. Because a party cannot be held vicariously liable for the acts of an independent contractor, *see Clausen v. Aberdeen Grain Inspection, Inc.*, 1999 S.D. 66, ¶ 15, 594 N.W.2d 718, 722, the District requests that we overturn the jury verdict.

[¶34.]     We agree with the District that the circuit court's agency instruction related to principles of tort liability rather than the parties' breach of contract action. *See Cameron v. Osler*, 2019 S.D. 34, ¶ 6, 930 N.W.2d 661, 663 ("The ancient doctrine of *respondeat superior* is well established as holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency."). More specifically, the phrase "act or omission" in the instruction implicates negligence and vicarious liability claims where none were pled in this case or presented to the jury.

[¶35.]     Despite any error in this instruction, however, the District has failed to establish prejudice by showing that the agency instruction in all probability affected the verdict. First, the circuit court did not instruct the jury on any substantive tort claims against the District. The substantive instructions addressed only principles of contract law. For example, Instructions 12, 15, 16, and 17 instruct on breach of contract and the duty of good faith. Instruction 14 involved the contractor's obligation to perform under the contract despite unforeseen difficulties. Instructions 19, 20, 21, and 25 address the correct measure of damages in breach of contract actions. Instruction 22 iterated a party's duty to mitigate contract damages. These instructions properly informed the jury that Excel could only recover against the District for a breach of the contract between the parties. Importantly, the special verdict form did not include any award for tort damages, but did include compensation for retainage, lost profits, and payments due and owing under the contract. Despite the erroneous language in Instruction 18, the instructions, when considered as a whole together with the special verdict form, correctly stated the law on breach of contract.

[¶36.]     Further, evidence was presented in this case that SKA was the District's contract representative with authority to act on its behalf. From the outset of the litigation, the District acknowledged that its relationship with SKA existed within the confines of contract. In its third-party complaint against SKA, the District averred that SKA acted as the District's representative and had

authority to resolve questions arising under the contract.[10] It also asserted that "as the engineer, SKA performed services on behalf of [the District], working with Excel to complete the subject Project." The District's grant of actual authority to SKA is reflected not only in the pleadings but also in the professional services contract with SKA and its Project contract with Excel. In the District's contract with SKA, it directed SKA to "act as [the District's] representative. All of the [District's] instructions to [Excel] will be issued through [SKA] who will have *authority to act* on behalf of the [District] to the extent provided in the specifications unless otherwise provided in writing."[11] (Emphasis added.)

[¶37.] Based on our review of the special verdict form, the jury instructions, and the record, the verdict awarding Excel contract damages was not attributable to any tort claim against either the District or SKA, but was instead based on the

---

10. The District relies upon *Glenn Construction Co. v. Bell Aerospace Services, Inc.*, a case limited to its facts, for the proposition that use of the word "representative" in the contract does not automatically create an agency relationship between SKA and the District. 785 F. Supp. 2d 1258 (M.D.Ala. 2011).

    *Glenn* held that agency must be decided based on "the peculiar facts" of each case. *Id.* at 1290. This is in line with our current test. *See Ehresmann v. Muth*, 2008 S.D. 103, ¶ 16, 757 N.W.2d at 405 ("Whether an individual is an agent is ultimately a question of fact."). The situation in *Glenn*, however, is distinguishable because it involved a summary judgment proceeding in which the court held that no reasonable jury could conclude the engineer acted as an agent. 785 F. Supp. 2d at 1289. Further, the question of agency was pertinent in *Glenn* because the case required deciding whether the owner was liable in *tort* for the acts of the engineer during the project. *Id.* at 1262

11. Additionally, Excel's contract contained numerous provisions requiring Excel to engage with SKA as a representative of the District. In that contract, the District stated that SKA "shall act as [the District's] representative during the contract period. [It] shall decide questions which may arise as to quality and acceptability of materials furnished and Work performed."

evidence of Excel's damages arising from the District's breach of contract. Excel introduced evidence of the District's contract obligations and SKA's authority to act on behalf of the District as its contract representative. The District's duties included providing Excel with adequate plans, access rights, extensions for delays beyond its control, and timely payments. Moreover, the contract required the District to proceed in good faith.

[¶38.] Throughout the nine-day trial, Excel introduced substantial evidence that the District refused to comply with these obligations in a number of ways. For example, the jury considered the District's decision to systematically deny change orders requested by Excel. Moreover, the jury considered evidence that once it became apparent that open trenching was required in Spawn's Addition, the District failed to work with Excel and the affected landowners to assist in identifying the appropriate locations of wooden stakes and grinder stations. Excel also produced evidence that unanticipated route changes, additions to the requested work beyond the original bid, and unexpected weather impeded timely completion of the Project. Despite these setbacks, the jury heard the District admit, through the testimony of its president, that it did not formally grant Excel a single adjustment to the Project timeline. The jury considered this and other evidence regarding the relationship and conduct of the parties and fashioned a verdict accordingly.

### IV. Whether the circuit court erred by allowing testimony regarding the District's emergency bidding procedures and instructing the jury on the same.

[¶39.] The District deemed the unfinished Project a public emergency and hired Dakota Road Builders (DRB) to complete the project without submitting the

contract for public bids. The nearly $500,000 contract the District negotiated with DRB was a major component of the District's damages claim against Excel.

[¶40.]        The District asserts that the circuit court erred by allowing Excel and Granite to present evidence on the District's emergency bidding procedures and in giving the jury an instruction regarding the same.[12] According to the District, the reasonableness of the completion contract was not an issue at trial because Excel's expert admitted that the District received a fair contract price when it hired Dakota Road Builders to finish the Project. Allowing evidence of a potential bidding violation, in the District's view, "provoke[d] the jury's instinct to punish."

[¶41.]        Excel and Granite disagree, arguing the evidence was critical to determining many of the issues between the parties, including the validity of the termination of Excel's contract and whether the District properly mitigated its damages. Excel presented evidence that the District did not treat the matter as an emergency because it waited two months to declare the emergency and four additional months to hire a contractor who was given no completion deadlines. And, in Excel's view, DRB, rather than addressing any emergency, simply completed the punch list Excel was never given. Alternatively, even if the emergency bidding instruction was error, Excel and Granite argue the error was harmless because the District has not shown the instruction or testimony had any impact on the jury's verdict.

---

12.    The court gave Instruction 23, providing: "A purchasing agency may make or authorize others to make an emergency procurement without advertising the procurement if rentals are not practicable and there exists a threat to public health, welfare, or safety or for other urgent and compelling reasons."

[¶42.]    "For evidence to be admitted at trial, it must first be found to be relevant." *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 30, 764 N.W.2d 474, 484.  Once found to be relevant, it is admissible unless specifically excluded.  *Id.*  In breach of contract cases, whether an injured party mitigated its damages is relevant because "[g]enerally, damages are not recoverable for losses the plaintiff could have reasonably avoided."  *Boxa v. Vaughn*, 2003 S.D. 154, ¶ 21, 674 N.W.2d 306, 313.

[¶43.]    The District's timeline and procedure in obtaining a replacement contractor was directly relevant to its alleged damages due to the delay in completing the Project.  Allowing the jury to consider evidence that related to the District's duty to mitigate its damages and instructing the jury on the same was within the purview of the circuit court.  Further, other than vague assertions, the District has failed to establish how it was prejudiced.  *See Vetter*, 2006 S.D. 21, ¶ 10, 711 N.W.2d at 615.  The circuit court did not abuse its discretion by allowing introduction of evidence on the District's emergency bidding procedures.

> **V.    Whether the evidence was sufficient to support the jury's damage award.**

[¶44.]    Finally, the District argues that the circuit court erred by denying its alternative motions for a new trial or judgment notwithstanding the verdict on the basis that the jury's verdict was excessive, speculative, or contrary to law.  Excel sought, and the jury awarded, three types of damages: (1) cost of unpaid or underpaid contract items; (2) retainage; and (3) lost profits.

[¶45.]    "The ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if

the contract had been performed . . . ." *Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 16, 908 N.W.2d 144, 151. Generally speaking, "[t]he amount of recovery may not exceed the amount the plaintiff would have gained if the contract had been fully performed." *Id.* We accord a jury verdict significant deference and will overturn a damages award only in "extreme cases." *Carpenter v. City of Belle Fourche*, 2000 S.D. 55, ¶ 7, 609 N.W.2d 751, 756. Such cases occur when a verdict is shown to be "excessive or inadequate . . . appearing to have been given under the influence of passion or prejudice or due to [i]nsufficiency of the evidence to justify the verdict." *ISG, Corp. v. PLE, Inc.*, 2018 S.D. 64, ¶ 26, 917 N.W.2d 23, 32. Testimony and evidence are reviewed "in a light most favorable to the verdict . . .." *Maryott v. First Nat. Bank of Eden*, 2001 S.D. 43, ¶ 10, 624 N.W.2d 96, 101.

[¶46.] With respect to damages relating to unpaid or underpaid contract items, the District argues Excel should not have recovered because the items were not in the contract. Further, in the District's view, Excel should not be allowed to recover additional costs associated with trenching in Spawn's Addition because Excel should have known the conditions in that area would accumulate extra costs. At trial, the jury considered these arguments and the testimony from Excel's president, Reed Olson.

[¶47.] Olson testified that the District owed Excel $483,770 for supplies and labor costs. In support of this testimony, Excel introduced corresponding exhibits including applications for payment, which the District rejected. For example, these exhibits included requests for payment for such things as: a manhole; insulation; a gravity sewer; lost time during pressure testing; quantities of 1.25-inch pipe and 3-

inch pipe; and costs to dig an open trench in Spawn's Addition. This evidence and our review of the record supports the jury's verdict awarding this amount.

[¶48.] The evidence further supports Excel's damages for retainage. In fact, the District's certified accountant, Gary Ritzman, agreed there was no dispute that the District owed Excel $285,921.81 for retainage.

[¶49.] Excel also sought consequential damages for lost profits claiming it was unable to successfully procure future contracts because of its impaired bonding status due to the District's breach. A litigant's ability to recover damages for lost profits that are both direct and consequential to a contract is well settled and has been recognized as a compensable form of damages for many years. *See, e.g., Stern Oil*, 2018 S.D. 15, ¶ 17, 908 N.W.2d at 151.[13]

[¶50.] To successfully recover contract damages, a litigant must first prove "that damages were in fact caused by the breach." *McKie v. Huntley*, 2000 S.D. 160, ¶ 18, 620 N.W.2d 599, 603. Additionally, to recover for lost profits the "[d]amages must be reasonably foreseeable . . .." *Stern Oil*, 2018 S.D. 15, ¶ 17, 908 N.W.2d at 151. In other words, they must have been "reasonably within the contemplation of the parties at the time of making the contract." *Id.* This requirement is an objective one—meaning that at the time the parties entered into the contract, they knew or should have known that lost profit damages would probably result from a

---

13. *See also ISG, Corp.*, 2018 S.D. 64, ¶¶ 25–26, 917 N.W.2d 23, 31–32; *Jorgensen Farms, Inc., v. Country Pride Corp.*, 2012 S.D. 78, ¶ 27, 824 N.W.2d 410, 419; *Lamar Advert. of S.D., Inc. v. Heavy Constructors, Inc.*, 2008 S.D. 10, ¶ 15, 745 N.W.2d 371, 376; *Diamond Surface, Inc. v. State Cement Plant Comm'n*, 1998 S.D. 97, ¶ 25, 583 N.W.2d 155, 161; *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 506 (S.D. 1977).

breach of the contract. *Denny Const., Inc. v. City and Cty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 750–51 (Colo. 2009).

[¶51.]     Further, damages must not be speculative; that is, the damages must be reasonably certain. *Stern Oil*, 2018 S.D. 15, ¶ 17, 908 N.W.2d at 151. To satisfy this requirement, "a plaintiff must establish a reasonable relationship between the method used to calculate damages and the amount claimed." *Id.* "Lost profits . . . due to impaired bonding capacity are not speculative as a matter of law." *Denny Const., Inc.* 199 P.3d at 743. Rather, like all claims for damages, they must be proven by the evidence.

[¶52.]     The District focuses its argument on its contention that "Excel failed to meet its burden of proof" because the lost profits it alleges are "too remote, speculative, and uncertain." In support of this argument, the District challenges the testimony of Excel's certified public accountant (CPA), Nina Braun, arguing that she lacked adequate data to forecast Excel's lost profits. In the District's view, the most Excel was entitled to recover is the full value of its contract with the District ($2,701,531.68), minus any payments Excel received—less the cost of completing the Project.

[¶53.]     Although a calculation for lost profits from future public improvement contracts might be difficult to ascertain under certain circumstances, this does not mean they are always unrecoverable. Courts in other jurisdictions have affirmed awards for lost profits due to impaired bonding capacity if the contractors proved their damage claims with reasonable certainty. *Laas v. Mont. State Highway*

#28580

*Comm'n*, 483 P.2d 699, 704 [pincite] (Mont. 1971); *Denny Constr. Inc.*, 199 P.3d at 743.[14]

[¶54.] At trial, Excel and Granite introduced detailed evidence demonstrating that the District's breach of contract significantly damaged Excel's bonding capacity. Travis Gusso, owner of Gusso Surety Bonds, who specializes in placing bonds for public work contractors, testified that he had written bonds for Excel for many years. In Gusso's opinion, the District's pending bond claim impaired Excel's business because it meant Excel could only procure "quick bonds" ranging from $250,000–$350,000 in aggregate coverage. This limited capacity precluded Excel from bidding on larger projects or working on several mid-range projects simultaneously.

[¶55.] To prove its history of bids on public improvement contracts before and after the alleged breach, Excel introduced its bid log from 2003 to 2016. It also introduced its contract log for the same period, which reflected the contracts that Excel was actually awarded. This contract bid and award history revealed that Excel had successfully bid on an increasing number of contracts in the years leading up to the Project. The logs for 2008 reveal that Excel submitted bids on twenty-nine

---

14. Although lost profit awards connected to impaired bonding capacity are relatively infrequent, this is not because they are legally impermissible, but rather because it is often difficult for litigants to prove these claims with reasonable certainty. Courts that have considered the question and denied recovery have done so, at least in part, because the lost profits stem from "unidentified contracts." *See Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 262 (Cal. 2004). This is not the case here. As outlined herein, Excel presented significant evidence in the contract bid and award logs showing its earning capacity before and after the Project until the date of trial.

projects and received five. The combined value of the five contracts was $795,966.68. In 2009, Excel bid on thirty-two contracts and was awarded four, worth a total of $817,594.10. Of the twenty-nine contracts Excel bid on in 2010, it received three totaling $901,208.89. In 2011, Excel was awarded four contracts after bidding on nineteen, with a total value of $843,471.70. Similarly, in 2012, Excel bid on thirteen contracts and was awarded this Project worth $2,701,531.68. This evidence established that, prior to the lawsuit, Excel averaged approximately $800,000 in contract awards annually.

[¶56.] However, after the District breached its contract with Excel and filed a claim against Excel's bond in 2014, Excel's business suffered significant losses. In 2014, Excel bid on five contracts ranging in amount from $150,000 to $300,000. It received two worth a total of $689,965.82. Then, in 2015, it bid on twenty projects ranging in value between $140,000 and $500,000. It received one contract worth $300,979.39. The next year, Excel submitted eleven bids for contracts valued between $100,000 and $500,000. Once again, it was awarded one contract worth just $222,524.72.

[¶57.] In addition to the bond and contract logs, Excel's and Granite's damages expert, Braun, testified to the lost profit damages Excel suffered. As a financial expert familiar with Excel's tax returns from 2009 to 2014 and financial statements prepared by another CPA for 2007 and 2008, Braun was qualified to testify as to Excel's profit margin. Relying on Excel's prior earning capacity between 2007 and 2014, Braun estimated that the most conservative value of

Excel's lost profits from the date of the breach until trial was $683,178, while the median range was $1,285,394, with the most aggressive projection at $2,545,219.[15]

[¶58.]　　　　Based on our review of the record, the jury did not award lost profits to Excel well into the future despite the District's arguments to the contrary. After considering Excel's tax returns, Braun's testimony, and an examination of over a decade of bid and contract logs, the jury valued Excel's losses at $800,000 from the date of breach until the date of trial. The evidence presented was sufficient to "establish a reasonable relationship between the method used to calculate damages and the amount claimed." *Stern Oil Co.*, 2018 S.D. 15, ¶ 17, 908 N.W.2d at 151. While the District was critical of Braun's opinions and the basis for her calculations, "[t]he credibility of witnesses and the evidentiary value of their testimony falls solely within the province of the jury." *In re S. D. Microsoft Antitrust Litig.*, 2003 S.D. 19, ¶ 30, 657 N.W.2d 668, 679. Moreover, the damages awarded by the jury were not excessive as they were on the lower end of the lost profit scenarios presented by Excel's expert.

[¶59.]　　　　We are mindful of the public policy concerns raised by amicus curiae with respect to Excel's damages award. Specifically, amicus contends that because governmental subdivisions have limited resources to finance public works projects, this verdict will affect underwriting practices in South Dakota. However, the District made no attempt to contractually limit Excel's claims for lost profits. Moreover, we have permitted awards for lost profits against public entities for

---

15. Braun examined Excel's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) to calculate true profitability.

decades if the damages were reasonably certain and proven by the evidence. *Arcon Constr. Co. v. S.D. Cement Plant*, 349 N.W.2d 407, 414–15 (S.D. 1984). While this may raise legitimate public policy issues, we believe such concerns should be directed to the Legislature. Based on our review of the record, and under the particular circumstances of this case, the evidence was sufficient to sustain the jury's verdict. The circuit court did not err by denying the District's motion for judgment notwithstanding the verdict or in the alternative, for a new trial.

## Conclusion

[¶60.] We affirm on all grounds. We need not address the District's claim that the circuit court erred by granting Excel's motion for summary judgment on the District's liquidated damages claim because the jury ruled for Excel. We affirm the circuit court's denial of the District's motion for summary judgment against Excel and decline the District's invitation to adopt the rule endorsed by the Wisconsin Court of Appeals in *Precision Erecting*. Further, the circuit court did not err by instructing the jury regarding the District's emergency bidding procedures. Although the circuit court erred by giving the agency instruction, the District has failed to establish reversible error on this basis. Finally, the jury verdict was not excessive, speculative, or contrary to law. Ample evidence exists within the trial record to support the jury's award of contract damages.

[¶61.] GILBERTSON, Chief Justice, and JENSEN, Justice, and CLARK, Circuit Court Judge, and KONENKAMP, Retired Justice, concur.

[¶62.] CLARK, Circuit Court Judge, sitting for SALTER, Justice, disqualified.