#30007-r-PJD
**2023 S.D. 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

TOM SMITH DBA TOM SMITH
MASONRY,                                        Plaintiff and Appellant,

v.

WIPI GROUP, USA, INC.,                          Defendant and Appellee,

and

LINCOLN COUNTY, SOUTH DAKOTA,                   Defendant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

JEFFREY L. BRATKIEWICZ of
Bangs, McCullen, Butler, Foye
    & Simmons, LLP
Sioux Falls, South Dakota              Attorneys for plaintiff and
                                       appellant.


RONALD A. PARSONS, JR. of
Johnson, Janklow & Abdallah, LLP
Sioux Falls, South Dakota              Attorneys for defendant and
                                       appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 9, 2023
OPINION FILED **09/20/23**

#30007

DEVANEY, Justice

[¶1.] Tom Smith Masonry (Smith Masonry) instituted a mechanic's lien foreclosure action against WIPI Group USA, Inc. (WIPI), seeking to recover the unpaid balance due under the parties' construction contract and an award of attorney fees. WIPI answered, asserting that Smith Masonry failed to properly complete the work called for in the contract. WIPI also asserted claims for breach of contract, breach of express warranty, and breach of implied warranty of reasonable workmanship. After a six-day bench trial, the circuit court determined that Smith Masonry had a valid mechanic's lien for the unpaid contract balance; however, the court further determined that WIPI was entitled to an offset because Smith Masonry's work did not meet a reasonable standard for construction of this nature. The court relied on principles of equity to deny both parties relief and ordered that each party be responsible for their own attorney fees and costs. Smith Masonry appeals, asserting the circuit court erred in multiple respects in denying its requested relief and abused its discretion in denying an award of attorney fees. We reverse in part and remand in part.

**Factual and Procedural Background**

[¶2.] Tom Smith owns and operates Smith Masonry, and at the time of the contract at issue, his sons, Brent and Brady, worked for his company. On February 14, 2014, Smith Masonry entered into a contract with WIPI to construct a fence along the front of WIPI's property in an industrial park. The construction of the fence was part of a larger project wherein WIPI was converting an industrial

-1-

building into a commercial office space. WIPI acted as the general contractor for the project, and counsel for WIPI drafted the contract with Smith Masonry.

[¶3.] WIPI agreed to pay Smith Masonry a total of $60,387, with 40% paid as a down payment, 57% due "upon satisfactory completion of the work as determined by both parties and as outlined in [the contract]," and 3%, retained by WIPI for one year, to be paid to Smith Masonry after satisfactory completion of the general guarantee contained in the contract. The contract stated that WIPI would pay Smith Masonry $28,620 for the construction and installation of twelve stone veneer columns for the fence and two additional stone veneer columns for a sign, $24,827 for subcontractor American Fence's portion of the work for fence panels and a gate, and $6,940 for a sign base. The contract incorporated a drawing by Tom depicting a rough layout of the columns and fence panels on the property. The drawing indicated that the columns would be 20 inches by 20 inches in width, with two-by-two-foot caps, and that square footings would be 46 to 48 inches deep. The contract also incorporated a surveyed site plan showing the proposed location of the columns and fence. Pursuant to the contract, if there were any change orders, they were to "be made by written agreement of all the parties."

[¶4.] After WIPI paid the down payment, but before any work on the project began, the parties executed an addendum to the original contract. Under the addendum, Smith Masonry agreed to construct a fence around the entire lot. This change required an additional 40 masonry columns at a sum of $95,400 and additional fence panels at a sum of $23,515. The contract indicated that the columns would be 29 inches by 24 inches in width, 6 feet tall, and spaced 24 feet

apart. Similar to the original contract, Smith Masonry was to construct the columns, American Fence was to install the panels, and any changes to the scope of the work were to "be made by written agreement of all the parties." WIPI agreed to pay an additional $118,915 under the same payment terms as the original contract. A surveyed site plan depicting the proposed location of the columns and fence was attached to the addendum.

[¶5.] When construction began, Smith Masonry subcontracted with Krueger Excavation to perform the dirt work and pour the concrete footings. Smith Masonry had Krueger Excavation pour circular (not square), 24-inch footings at a depth of 46 to 48 inches. Tom claimed that he used circular rather than square footings because the auger drilled circular holes and the use of circular footings made it easier for Smith Masonry to keep the fence within the property boundary lines.

[¶6.] While Krueger Excavation was responsible for digging the holes for the column footings and for pouring the concrete, Smith Masonry determined the location of the holes. Tom and his son Brady both testified that the presence of underground utilities played a role in where the holes ended up being dug and in the number of columns Smith Masonry ultimately constructed. As a result, while the contract called for 52 columns, Smith Masonry constructed 59 to avoid utility lines and "for the spacing to work out[.]" The change in the number of columns constructed and other changes raised the total cost of the project to $201,387. Tom claimed that WIPI approved these changes and that change orders were drafted as a result. However, WIPI never signed the change orders.

[¶7.]     In addition to constructing 59 rather than 52 columns, Smith Masonry constructed larger columns than what the contract called for. While this increased the cost of the columns, Smith Masonry did not charge WIPI for the increased cost. According to Tom, larger columns were constructed "[f]or the general appearance of the structure and to receive the fence and make sure it was finished and balanced and proportionate." Tom also claimed that WIPI approved the larger columns. In regard to the spacing between the columns, Tom testified that Smith Masonry did not space the columns 24 feet apart or place the columns in accord with the site plan attached to the contract because the terrain made it impossible to do so. He further testified that WIPI was aware of the inconsistent spacing and voiced no objection.

[¶8.]     In August 2014, WIPI advanced Smith Masonry $50,000. WIPI claimed that Smith Masonry requested the advance because it needed to pay subcontractors and to purchase materials. Around this same timeframe, Smith Masonry requested final payment under the contract, and thereafter, Tom and Brady conducted a walk around the property with Albino Aboug (the owner of WIPI) to look at the columns. Tom testified that Albino expressed approval of the columns, did not indicate there were too many, and did not express any concerns about the spacing or aesthetics. As to these matters, Brady testified similarly to Tom.

[¶9.]     Brady also testified that by this time, American Fence had nearly completed its work installing the panels. While American Fence had dug holes for the posts that would become the gooseneck stand with a keypad for the front gate to

slide back and forth, American Fence could not install the gate operator because electricity had not been provided. According to Brady, WIPI believed Smith Masonry was required to run electricity to the keypad so the gate operator could function. Brady explained that after he informed WIPI that neither Smith Masonry's contract nor American Fence's contained the requirement to run electricity to the gate operator, the parties tried to address the issue. While discussions were ongoing about the gate, the parties were also having conversations about final payment to Smith Masonry and about American Fence's request for payment for its completed work. It is undisputed that WIPI did not make further payment to Smith Masonry. It is also undisputed that American Fence stopped work on the project in September 2014.

[¶10.] When American Fence stopped work, all of the fence panels had been installed; however, some of the brackets needed adjusting to bring the fence panels into alignment. Also, although the gate had been installed and the holes were drilled for the gate operator, American Fence did not install the gate operator or finish securing the gates because electricity was never provided.

[¶11.] Between September and December 2014, Smith Masonry and WIPI had multiple conversations concerning final payment on the project, including payment to American Fence. However, WIPI refused to remit further payments, and American Fence filed a mechanic's lien on WIPI's property. Although Smith Masonry was required under the contract to indemnify and defend against this subcontractor lien, WIPI made a direct payment to American Fence for $38,000 to

satisfy the lien. According to American Fence, it was not made whole by WIPI's payment but accepted it and released the lien based on an agreement with Tom.

[¶12.] Although WIPI paid American Fence to satisfy American Fence's mechanic's lien, it continued to refuse to remit final payment to Smith Masonry. On December 15, 2014, Smith Masonry filed a mechanic's lien for $41,672 on WIPI's property, representing what Smith Masonry believed it was owed under the contract. Thereafter, the parties communicated about concerns WIPI had related to the fence project and Smith Masonry's attempts to obtain final payment. At some point in 2016, while communications were ongoing between Smith Masonry and WIPI, American Fence went to WIPI's property to attempt to address, at no additional cost to WIPI, alignment issues that had occurred with the fence panels. However, WIPI did not allow American Fence to do the work. WIPI also refused to remit any additional payment to Smith Masonry.

[¶13.] In January 2017, Smith Masonry instituted this action to foreclose on its mechanic's lien. In its complaint, it claimed that it "timely and properly and substantially completed its work in accordance with its agreement with" WIPI. It further claimed that WIPI had made total payments in the amount of $159,714.90, leaving a total unpaid balance of $41,672.20 as of September 23, 2014. Smith Masonry requested that the circuit court find its lien valid and foreclose on the lien to satisfy the amount owed. Smith Masonry also requested an award of attorney fees.

[¶14.] In its answer, WIPI denied that Smith Masonry "properly completed the work called for in the contract" and the addendum. It also asserted multiple

counterclaims, including breach of contract, breach of express warranty, and breach of implied warranty of reasonable workmanship. WIPI alleged that Smith Masonry's "faulty workmanship has resulted in stone columns that have heaved and/or moved[,]" referring specifically to a failure to provide footings at a sufficient depth. WIPI further alleged that the movement of the columns caused the steel posts and crossbeams that connect the stone columns to move. WIPI asserted that because of Smith Masonry's faulty workmanship, the fence must be totally removed and replaced at a cost in excess of the parties' original contract price. WIPI sought damages at an amount not less than $300,000.

[¶15.] A six-day bench trial was held on February 6–8, May 13–14, and May 16, 2019. Tom, Brady, and Brent each testified about the construction of the columns. Tom acknowledged that the columns were not constructed in conformity with the contract specifications, namely that there were more columns, the columns were larger, and the columns were not spaced 24 feet apart. However, he testified that each change was approved by WIPI and opined that the columns were nevertheless constructed to masonry standards. When questioned about issues that had been identified in WIPI's pretrial expert witness disclosures (in particular, Smith Masonry's use of circular foundations that were smaller in diameter than the constructed columns and whether this could cause the columns to shift), Tom and Brady each opined that the circular foundations aligned with masonry standards and provided a sufficient foundation for the constructed columns. Tom was also questioned about Smith Masonry's decision to not center some of the columns on the foundations, which then resulted in these columns having a lip or ledge

overhanging the footing. He testified that the placement decision was intentional and was done for aesthetic reasons (i.e., to adjust spacing between columns) and that the offset of the columns on the footings was not a problem because they would still be adequately supported by the footings.

[¶16.] Tom, however, agreed that one of the columns was leaning, that there were multiple fence panels out of alignment, and that there were connection issues between the panels and columns. In Tom's view, the one column that was noticeably tipping was not something Smith Masonry could have controlled because it was the result of the column being in the drainage way of the building's gutter system. He explained that "[w]ater is masonry's worst enemy" because of "[t]he frost cycles, the wet soils, all conditions related to the water." He further claimed that other than the one column, the rest "were nice and apportioned or in good level or plumbness" and that they "were in line and true."

[¶17.] In regard to the fence portion of the project, Matt Vogel explained that American Fence had agreed to install 376 feet of five-foot tall, eight-foot wide black ornamental steel fence panels between the masonry columns with intervening support posts. The intervening support posts were installed with 36- to 42-inch deep footings, and the spacing between two masonry columns dictated whether American Fence installed one or two intervening support posts. According to Vogel, attaching this type of fence to masonry columns is difficult. He testified that some of the brackets he used for attaching the fence panels to the columns did not attach right and that some panels were not aligned. He also testified that the front gate American Fence installed had fallen to the ground.

[¶18.]     According to Vogel, the issues with the fencing were not Smith Masonry's fault, and he explained that American Fence would ordinarily make final adjustments after completing the installation to remedy any issues.  However, on this project, American Fence did not conduct a walkthrough to address what he regarded as "punch list" items because they stopped work on the project due to nonpayment, and when they later attempted to return to the project to remedy these issues, WIPI would not allow them to do so.

[¶19.]     Smith Masonry also called Corey Visscher from Michaels Fence & Supply as a witness.  In March 2015, Visscher had been asked by counsel for WIPI to examine WIPI's fence to determine what could be done to repair it.  He testified that when he examined the fence, he could see alignment and attachment issues. He further testified that he did not see anything wrong with the connections to the masonry columns, but he noticed issues with the connections between the fence panels and the fence posts.  His proposal to remedy the "up and down look of the fence" was to change the type of brackets used to one that could be adjusted vertically when necessary, for a total cost of $1,555.96 plus tax.

[¶20.]     For its case-in-chief, WIPI called Paul Reynolds as a witness to testify about his knowledge of constructing foundations to account for the freeze/thaw cycle based on his thirty years in the construction industry.  WIPI had hired Reynolds's company to construct the office spaces, conference rooms, and a second floor in the building on the site and to be in charge of constructing the façade on the outside of the building.

[¶21.]     Reynolds testified that he was still working at the site when Smith Masonry and American Fence were working on the fence project. He claimed that he had noticed horizontal and vertical movement in the fence panels, bolts coming off where the panels were connected to the columns, and some columns leaning. Reynolds expressed his opinion that the foundations for the columns were not constructed properly because the foundation did not encompass the entire column, leaving edges or ridges along the foundation. The shape and size of the footing was also problematic, according to Reynolds, because it was circular in shape and smaller than the base of the column; therefore, if the dirt "freezes to a point, it is going to start to push up." He opined that this is "what happened in this situation."

[¶22.]     When asked, "What would be involved in trying to repair this," Reynolds replied that "[t]he simplest way but, unfortunately, the most expensive way, would be to wipe them out and rebuild them." He agreed that regardless of whether repair or replacement is done, "either method is going to involve lots and lots of labor" and each column would need to be repaired or replaced. However, during cross-examination, he conceded that he could not say whether he saw any of the foundations being installed and he only looked at a few columns where the fence panels had fallen down. He also acknowledged that he did not look at the fence posts and could not rule out that the posts could have caused the stress on the fence panels.

[¶23.]     WIPI also called surveyor Eric Meyer. WIPI had retained Meyer in February 2017 to conduct a survey of the horizontal and vertical position of the columns, the fence posts between the columns, and the points where the fences

attached to the columns. Meyer testified that when he looked down the fence line, "it didn't look like it was all the same elevation" and "you could see it, they weren't lining up." Regarding his survey, Meyer testified that he determined the elevation and horizontal position of every post and column and whether the columns were evenly spaced apart. He then conducted the same survey a year later in March 2018, so he could determine whether movement had occurred since 2017. Referring to an exhibit he created, Meyer testified that all the columns within his survey, except for one or two, registered measurable movement.

[¶24.] To supplement Meyer's testimony about the fact of movement, WIPI called Karl Liester, a geotechnical engineer, to testify about the cause of the movement of the columns, fence posts, and panels. Liester testified that he visited the site in November 2017, and based on his visual observation, he could see that some columns and fence panels were out of alignment. As part of his testimony, multiple photographs were admitted into evidence depicting what Liester had observed during his November 2017 inspection; during part of an excavation conducted on one column in March 2018; and from another site visit in May 2019. Through these pictures, Liester described the vertical and lateral movement occurring with the fence panels and the vertical movement of the steel fence posts.

[¶25.] In regard to the columns, Liester testified, consistent with Tom's opinion, that one column on the north end of the gate is noticeably leaning, but he also testified that the entire row of columns on the east end was starting to lean out. In Liester's view, the possible causes for this movement "would be expansive soils, soft soils, frost heave, some type of structural damage[.]" He further

explained that if the foundations for the columns were not constructed correctly, the freeze/thaw cycle could move the structures. According to Liester, constructing the columns with larger footings and placing the columns squarely on top of the footings, as depicted in Tom's drawing that was made part of the contract, could have minimized the problems he identified. He also testified that it is "very likely" the fence as currently constructed will continue to experience movement if not repaired and claimed that while adjusting the fence panels would probably provide a temporary fix, this would not fix the movement in the columns.

[¶26.] However, on cross-examination, Liester agreed that multiple other factors could cause movement in the columns, including wind, gravity, tectonic activity, vandalism, settlement, the high water table at this location, frost, surface water drainage, grading, etc. He conceded that movement could still have occurred had Smith Masonry constructed larger and deeper footings. He also agreed that he could not say whether any of the columns other than the one he excavated had "an overhang" and agreed that not every single column would have to be removed. He further agreed that other forms of remediation such as adjustments to the fence panels should probably be tried before removing columns. He did not express an opinion on cost of any repairs.

[¶27.] As its last witness, WIPI called Keith Stroh as an expert related to construction standards and WIPI's damages. However, a dispute arose concerning the permissible scope of his testimony. Smith Masonry asserted that WIPI disclosed Stroh only as an expert as to cost of repair or replacement, not on the cause of the alleged damage, and objected to Stroh testifying beyond these disclosed

matters. While WIPI disagreed with this characterization of Stroh's expert disclosure, the parties agreed to a continuance for WIPI to update its expert disclosure. In a supplemental report, Stroh opined that the columns failed to meet masonry standards and that WIPI sustained $650,000 in damages. But this report never became part of the trial record because the trial never resumed. In September 2021, WIPI and Smith Masonry agreed to have the circuit court decide the case on the existing trial record.

[¶28.]     On October 27, 2021, the circuit court issued a memorandum decision detailing its findings and conclusions, and after receiving Smith Masonry's objections, the court issued supplemental findings and conclusions on December 29, 2021. The court found that Smith Masonry proved "a legally enforceable agreement and obligation to pay for all the work completed." It further found that Smith Masonry "has a valid Mechanic's Lien for the work completed." However, in the court's view, "the issues in this case turn on the quality of the work, rather than deviations from the original plans[.]"

[¶29.]     In that regard, the court found "that at least some of the masonry columns failed to meet a reasonable standard of care for the application and specific geological conditions at the site." In particular, the court determined that the construction of the footings and the placement of the columns on the footings allowed "surface ground heave due to frost to leverage the columns and cause them to tilt out of plomb [sic]" and that column shifting "caused some of the metal fencing panels to twist and fail." The court rejected Smith Masonry's contention that climate and seasonal weather fluctuations inherently cause movement of structures

and that the construction of the columns met industry and construction standards, finding instead that "the evidence shows that [Smith Masonry's] construction practices resulted in shifting [of] the columns that was unreasonable and outside the tolerances allowed for quality construction of this nature."

[¶30.]     The circuit court did not enter specific conclusions determining whether WIPI proved its counterclaims.  However, the court agreed with Smith Masonry's assertion that the counterclaims "are meritless because, among other reasons, adequate notice and opportunity to remediate the alleged defects was never provided" and WIPI did not allow Smith Masonry "to come in and mitigate the harm caused by the slightly off-kilter columns."  The court further determined that WIPI's interference "with reasonable efforts by American Fence and [Smith Masonry] to secure and attach the fencing panels in a way that would have significantly mitigated [WIPI's] damages" amounted to a "breach of [WIPI's] implied duty to allow reasonable access to its property for work to be performed to correct any warranty issues."

[¶31.]     In its conclusions of law, the court determined that WIPI was entitled "to a sum of damages or, in the alternative, an offset against the balance due" under the contract because of Smith Masonry's non-conforming work.  The court then determined that an offset was warranted.  With regard to the amount of offset, the court noted that "there was no evidence presented of any diminution of value to the property, either before or after the thwarted remediation work[,]" and the court rejected WIPI's claim that the entire fence structure "must be razed and rebuilt[.]"  The court also found that "the actual cost of remediation wasn't established with

exactitude at trial," but it nevertheless concluded that WIPI was entitled to an offset of the entire lien amount.

[¶32.]     Further, the court determined that given the "absence of any precise calculation afforded by the incomplete evidence on both sides of the respective claims, principals [sic] of equity apply to allow for the wholesale offset of any money damages awarded to either party." The court then valued the parties' claims as equal due to wrongdoing by both parties. In that regard, the court stated that the value WIPI received for Smith Masonry's work "is equivalent to what was paid, and the balance due under the mechanic's lien would be unjust enrichment to [Smith Masonry]. Conversely, the cost to remediate the flaws in [Smith Masonry's] work/diminution in the value of the property as a whole due to [Smith Masonry's] poor workmanship are equivalent to the unpaid balance forfeited by [Smith Masonry]." Finally, the circuit court denied Smith Masonry's request for an award of attorney fees, concluding that "each of the parties shall assume its own costs and disbursements herein, including attorney fees."

[¶33.]     Smith Masonry appeals, asserting the following restated issues:

1.     Whether the circuit court erred in denying Smith Masonry a judgment of foreclosure on the mechanic's lien for the full amount of the recorded lien.

2.     Whether the circuit court erred in denying Smith Masonry's request for an award of attorney fees.

## Standard of Review

[¶34.] We review the circuit court's findings of fact for clear error. *Mathis Implement Co. v. Heath*, 2003 S.D. 72, ¶ 9, 665 N.W.2d 90, 92. However, a court's conclusions of law are reviewed de novo. *Action Mechanical, Inc. v. Deadwood Historic Preservation Comm'n*, 2002 S.D. 121, ¶ 12, 652 N.W.2d 742, 748

## Analysis and Decision

**1.** ***Whether the circuit court erred in denying Smith Masonry a judgment of foreclosure on the mechanic's lien for the full amount of the recorded lien.***

    *a.* *Whether Smith Masonry fully performed under the contract*

[¶35.] Smith Masonry claims that the evidence presented at trial established that it completed the masonry portion of the fence project and thus fully performed under the contract. It deems "immaterial" that American Fence's portion of "the fencing aspect of the project had not been finished" because American Fence, not Smith Masonry, was responsible for that portion of the project.[1] Finally, Smith Masonry asserts that because it fully performed, it is entitled to full payment under the contract.

---

1. Smith Masonry further asserts that "[a]s a matter of law, WIPI's settlement with American Fence released [Smith Masonry] from any further legal obligations or responsibilities concerning the fencing aspect of the project." It directs this Court to *Estate of Williams v. Vandeberg*, for the proposition that "a release of an agent is a release of the principal even when the release contains an express reservation . . . ." 2000 S.D. 155, ¶ 15, 620 N.W.2d 187, 191. But there is no evidence in the record that WIPI and American Fence executed a release. The record establishes only that WIPI paid American Fence $38,000 to facilitate completion of the project and to have American Fence's lien released.

[¶36.] A review of the record reveals that American Fence was Smith Masonry's subcontractor. In fact, Smith Masonry's complaint refers to them as such. American Fence did not have a contract with WIPI. Rather, American Fence was identified in Smith Masonry's contract with WIPI. Also, as Tom testified, Smith Masonry was responsible for paying American Fence for its work under the contract. Because it is undisputed that American Fence did not fully complete its portion of the work on the project, the fencing project as a whole was not complete and Smith Masonry cannot prevail on its claim that it fully performed and was, in that regard, entitled to full payment under the contract.

> b. *Whether Smith Masonry substantially performed under the contract*

[¶37.] Alternatively, Smith Masonry claims that, at the very least, it substantially performed under the contract and would thus be entitled to recover the unpaid contract balance. It notes that the circuit court did not specifically find that the doctrine of substantial performance applied; however, in its view, the circuit court's rulings suggest it did because the court reduced the amount of the lien by what it regarded to be deficient construction practices.

[¶38.] As this Court explained in *Ahlers Building Supply, Inc. v. Larsen*, the party seeking to recover the contract price has the burden of proving substantial performance of the contract. 535 N.W.2d 431, 435 (S.D. 1995). Further, "[t]he question of substantial performance is a question of fact[.]" *Id.*

[¶39.] Here, the circuit court did not specifically determine whether Smith Masonry substantially performed under the contract. The court found that some of the work on the project was defective, "thus entitling [WIPI] to a sum of damages

-17-

or, in the alternative, an offset against the balance due as a result of the non-conforming work." However, the court also found "that the facts at trial established a legally enforceable agreement and obligation to pay for all the work completed" and that Smith Masonry proved it has a valid mechanic's lien for the work completed.

[¶40.]     "It must be remembered that substantial performance is not full performance and that the party who relies on the doctrine has breached his contract." *Ahlers Bldg. Supply*, 535 N.W.2d at 435 (citation omitted). When a contractor has breached a construction agreement and seeks to recover for the work performed, the remedy available to the contractor depends on whether the contractor has substantially performed the contract. "If performance was substantial, the contractor is entitled to recover the contract price less deductions for defects in performance. If performance was not substantial, the contractor is entitled, at most, to the value of the benefit that he conferred upon the owner under a theory of quantum meruit or unjust enrichment, and not the contract price minus defects." *Id.* (internal citations omitted) (quoting *Van Den Hoek v. Bradwisch*, 273 N.W.2d 152, 154 (S.D. 1978)).

[¶41.]     Based upon the circuit court's determination that Smith Masonry was entitled to enforce the terms of the agreement, less any defects, we can only conclude that the circuit court found Smith Masonry had substantially performed. "[B]y the nature of the damages it awarded, the court obviously found [the contractor] substantially performed its contract." *Id.* A review of the circuit court's

decision supports that the doctrine of substantial performance applies under the circumstances presented.

> c.  *Whether the circuit court erred in wholly offsetting the amount of Smith Masonry's mechanic's lien*
>
> i.  *Contract Warranties*

[¶42.]    Smith Masonry claims that the circuit court ignored "the express contract terms and conditions" when it reduced the amount of, or eliminated, Smith Masonry's recoverable mechanic's lien.  In particular, Smith Masonry claims that WIPI is not entitled to compensation for defects related to the columns under the general guarantee provisions in its contract with Smith Masonry.

[¶43.]    Looking at the relevant contract provisions here, WIPI agreed to pay Smith Masonry 57% "of the contract sum upon satisfactory completion of the work" under the contract and was to retain 3% of the contract sum for one year with the amount being paid after satisfactory completion of the general guarantee provision of the contract.  The general guarantee provides:

> The Contractor shall remedy any defect due to *faulty material or workmanship* and pay for any damage to other work resulting therefrom which shall appear within the period of *one year from final payment.*

(Emphasis added.)

[¶44.]    Smith Masonry acknowledges that in withholding final payment when such was requested in 2014, WIPI expressed concerns related to the faulty workmanship in the installation of the fence panels.  However, Smith Masonry claims that WIPI did not express a concern about faulty construction of the columns until after Smith Masonry filed its lawsuit in 2017 to foreclose its mechanic's lien.

In Smith Masonry's view, WIPI's only concerns prior to that point related to the number of columns and spacing between them not conforming to the contract terms—claims that were rejected by the circuit court in its finding that WIPI had "tacitly approved" these deviations. Thus, Smith Masonry claims that the general guarantee expired even though final payment has not been remitted. It further asserts that even if it "had a theoretical warranty obligation to WIPI," its obligation under the warranty "disappeared the moment WIPI refused to pay [Smith Masonry] the contract balance" because such nonpayment was a material breach of the contract relieving Smith Masonry of any duty to perform warranty work.

[¶45.] While a review of the record supports that WIPI did not initially express an issue with the construction of the columns, Smith Masonry's contractual guarantee related to the fence project as a whole, not just its masonry work on the project. Moreover, as early as January 2015, WIPI identified issues with the misalignment and bowing of the fence, and as the circuit court identified from the evidence at trial, the misalignment and twisting of some fence panels was caused by the shifting of columns to which they were attached.

[¶46.] Importantly, nothing in the guarantee requires WIPI to immediately identify the *cause* of the defect. Thus, the fact that it did not claim until later that the issues with the fence were caused by faulty construction of the columns does not relieve Smith Masonry of its obligations to remedy the defects. Because there is evidence establishing a lack of "satisfactory completion of the work," the general guarantee had not expired.

[¶47.] Nevertheless, Smith Masonry asserts that any defects related to the fence panels were excluded by American Fence's express warranty. American Fence's warranty provides that it "shall not be liable for and this warranty does not apply to any failure, defect or damage resulting from and/or connected with . . . [a]ny alteration, adjustment, settling or materials as a result of freeze thaw cycle, further settling of soil, and varied precipitation that may cause ground swell. This includes gates, gate posts, and associated alignments. This is a natural process that cannot be predicted nor prevented and thus cannot be warranted."

[¶48.] Although the record contains evidence to support that the fence panels moved because ground freeze caused the *fence posts* (not just the columns) to rise, circumstances specifically excluded under American Fence's warranty, there is testimony from Vogel that when American Fence stopped work on the project in 2014, there were workmanship issues unrelated to ground freeze with how some of the fence panels attached to the masonry columns. Vogel referred to his notes indicating that some panels had issues with the brackets attaching to the columns and that there were issues with certain bolts and connectors. He testified, "I'm not proud of this at all. Those are tough to put on these styles of columns." Thus, as it relates to at least some of these defects, American Fence's warranty exclusions do not apply.

ii. *Principles of Equity*

[¶49.] Smith Masonry claims the circuit court erred in applying equitable principles to "allow for the wholesale offset of any money damages awarded to either party" because an express contract controls and WIPI's counterclaims and

requests for an offset arise out of the same express contract. Although an action to foreclose on "a mechanic's lien is an action in equity[,]" *Action Mechanical*, 2002 S.D. 121, ¶ 13, 652 N.W.2d at 748, "an obligation must exist under either an express or implied contract[,]" *id.* ¶ 35, 652 N.W.2d at 753. And when, as here, there is no dispute that an express contract governs the right to recover under the mechanic's lien and neither party seeks damages in equity, equitable principles such as unjust enrichment and unclean hands are inapplicable.

[¶50.] As the Court in *J. Clancy, Inc. v. Khan Comfort, LLC* explained, "equity will not interfere" in a case when a contract controls the parties' relationship. 2021 S.D. 9, ¶¶ 43, 44, 955 N.W.2d 382, 397 (noting that "where there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or [claim] on quantum meruit" (citation omitted)). In its complaint, Smith Masonry alleged it had substantially performed the agreement with WIPI and was entitled to recover the balance owed under the express terms of the agreement. Smith Masonry did not seek any recovery in equity.

[¶51.] Moreover, there is nothing in the record or the court's findings to support that Smith Masonry acted with unclean hands. The only evidence of acting "improperly or unethically in relation to the relief" requested is that relating to WIPI's actions. *See Adrian v. McKinnie*, 2002 S.D. 10, ¶ 17, 639 N.W.2d 529, 535 (explaining conduct that would constitute unclean hands). As the circuit court determined, WIPI "made absurd counterclaim demands that could never be justified under the facts or law." Therefore, the circuit court erred in applying equitable

principles when determining whether Smith Masonry can recover the amount unpaid by WIPI under the contract.

### iii. The Decision to Allow an Offset

[¶52.] Smith Masonry contends the circuit court's finding that the misalignment issues with the metal fencing were caused by its deficient construction practices relating to the columns was "improperly based on the theories and opinions of WIPI's retained expert Keith Stroh," who did not testify at trial. Smith Masonry further argues that because Stroh did not testify, "there is no basis for the trial court's findings and conclusions that [Smith Masonry] failed to properly construct the masonry columns" and no evidence in the record to support "that the masonry columns moved excessively or were misaligned."

[¶53.] In response, WIPI directs this Court to the testimony of Reynolds, Meyer, Liester, Vogel, Tom, and his sons. In particular, it claims that the testimony and evidence at trial support the circuit court's determination that the footings were inadequate for the columns Smith Masonry constructed. It further claims that the testimony and evidence establish that the inadequate footings caused the columns to move and lean when the ground began to heave due to frost, which then caused the fence panels to move, twist, bend, and break off from the brackets.

[¶54.] In its reply brief, Smith Masonry acknowledges that Reynolds and Liester testified that the columns were deficiently constructed and that they both relied on exhibits in support.[2] However, Smith Masonry claims that such testimony

---

2. Smith Masonry claims that because the circuit court "did not mention these witnesses or exhibits in its decision[,]" this Court cannot assume the court

(continued . . .)

is insufficient to support reducing the amount of its recoverable mechanic's lien because the testimony "was grossly unreliable." Alternatively, Smith Masonry asserts that even if the circuit court did not err in finding that its construction of the fence was defective, the court erred in offsetting the full amount of its mechanic's lien because WIPI failed to prove the amount "of recoverable damages for any alleged defect" and the record does not contain evidence that would support an offset of $41,672.20 (the full amount of the mechanic's lien) in alleged repair costs.

[¶55.]     This Court has said that when there is "substantial performance, the proper measure of damage is the contract price less the cost of the defect." *Mathis*, 2003 S.D. 72, ¶ 12, 665 N.W.2d at 93. In its counterclaim and at trial, WIPI asserted that it would be required to demolish all of the columns and build anew to remedy Smith Masonry's deficient performance under the contract. On appeal, it claims the testimony from Liester and Reynolds supports its contention that labor and costs for repair would be substantial and involve a redo of the project. It then contends that "[g]iven the more than $200,000 cost for the original fence and acknowledgement that many of the materials could not be reused, it took no great leap to conclude there was an adequate evidentiary basis to find with reasonable

---

(. . . continued)

relied on the testimony of these witnesses. But "[d]oubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's 'version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.'" *Osman v. Karlen & Assocs.*, 2008 S.D. 16, ¶ 15, 746 N.W.2d 437, 443 (citations omitted).

certainty that such costs would exceed or at least equal the $41,672.20 equitable interest sought to be enforced against the property."

[¶56.] The problem with WIPI's argument is that the circuit court specifically rejected WIPI's claim "that the entire fence structure is unfit for its intended purpose and must be razed and rebuilt at a tremendous cost, exceeding the overall contract price[.]" Rather, the court found that "only a few of the columns would need to be repaired or replaced, and the flexing of the metal fence panels could be remediated by the use of panel fasteners with play or tolerances." The court noted that "other than that, the columns are aesthetically pleasing and consistent with the contract." Moreover, the court found that WIPI breached an "implied duty to allow reasonable access to its property for work to be performed to correct any warranty issues" when it "interfered with reasonable efforts by American Fence and [Smith Masonry] to secure and attach the fencing panels in a way that would have significantly mitigated [WIPI's] damages."[3]

[¶57.] As previously stated, because it is apparent the circuit court found Smith Masonry met its burden of proving that it substantially performed, Smith

---

3. Relevant to this finding by the circuit court, "[t]he law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertion to render the injury as light as possible." *Arrowhead Ridge I, LLC v. Cold Stone Creamery, Inc.*, 2011 S.D. 38, ¶ 16, 800 N.W.2d 730, 735 (citation omitted). Therefore, "[i]f, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him." *Id.* "The burden is on the breaching party to prove that 'damages would have been lessened by the exercise of reasonable diligence on the part of the non-breaching party.'" *Casper Lodging, LLC v. Akers*, 2015 S.D. 80, ¶ 67, 871 N.W.2d 477, 498 (citation omitted). Here, the circuit court appears to have concluded that Smith Masonry proved that WIPI failed to mitigate its damages.

Masonry was entitled to recover the contract price less any defects. *See Ahlers Bldg. Supply*, 535 N.W.2d at 435; *Barton Masonry, Inc. v. Varilek*, 375 N.W.2d 200, 202 (S.D. 1985) (providing that "a party who sues to recover on a construction contract has the burden of proving substantial performance of that contract"). However, WIPI did not present *any* testimony or evidence establishing the cost necessary to remedy Smith Masonry's defective performance under the contract. It is well settled that "damages must not be speculative; that is, the damages must be reasonably certain." *Excel Underground, Inc. v. Brant Lake Sanitary Dist.*, 2020 S.D. 19, ¶ 51, 941 N.W.2d 791, 805. As the Court in *McKie v. Huntley* explained,

> Proof of damages requires a reasonable relationship between the method used to calculate damages and the amount claimed. *See Swenson v. Chevron Chemical Co.*, 89 S.D. 497, 234 N.W.2d 38, 43 (1975). In applying this rule, we refrain from dictating any specific formula for calculating damages. Instead, we apply a "reasonable certainty test concerning the proof needed to establish a right to recover damages." *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 506 (S.D. 1977) (citations and internal quotations omitted). Reasonable certainty requires proof of a rational basis for measuring loss, without allowing a [fact finder] to speculate. *Id.* at 506 (quoting *Kressly v. Theberge*, 79 S.D. 386, 112 N.W.2d 232, 233 (1961) (further citations omitted)).

2000 S.D. 160, ¶ 18, 620 N.W.2d 599, 603–04. Therefore, "[o]nce the existence of damage has been shown by a preponderance of the evidence, a claimant must produce only the best evidence available to allow a [fact finder] a reasonable basis for calculating the loss." *Id.* ¶ 20, 620 N.W.2d at 604.

[¶58.]     Here, accepting the circuit court's findings that WIPI was entitled to a reduction in the amount of Smith Masonry's mechanic's lien for Smith Masonry's deficient performance under the contract, WIPI was required to produce evidence to

allow the court a reasonable basis to calculate the cost of repair. It did not do so. Because WIPI did not present any evidence of cost of repair such that the court could determine an amount to offset from the remaining amount due under the contract, and given the court's determination that WIPI failed to mitigate at least some of its damages, the court erred in denying Smith Masonry's request for an award of the amount due under the contract. Therefore, the court's denial is reversed, and the matter is remanded for the court to enter a judgment of foreclosure in favor of Smith Masonry on its mechanic's lien.

### 2. Whether the circuit court erred in denying Smith Masonry's request for an award of attorney fees.

[¶59.] Smith Masonry contends that an award of attorney fees was warranted under the circumstances because it defeated a $650,000 counterclaim, and assuming this Court finds in its favor on appeal, it was successful on its mechanic's lien action. Under SDCL 44-9-42, "[t]he court shall have authority in its discretion to allow such attorney's fees and receiver's fees and other expenses as to it may seem warranted and necessary according to the circumstances of each case, and except as otherwise specifically provided in this chapter" on mechanic's and materialmen's liens. "This Court has consistently required a trial court to enter findings of fact and conclusions of law when ruling on a request for attorney's fees." *Hoffman v. Olsen*, 2003 S.D. 26, ¶ 10, 658 N.W.2d 790, 793. Here, the circuit court did not enter any findings of fact on Smith Masonry's attorney fee request; it simply ordered that both parties are responsible for their own attorney fees. In light of the court's erroneous application of principles of equity and determination that WIPI is

entitled to a wholesale offset of the amount due on the contract, the court is directed on remand to reconsider the attorney fee request and to make necessary findings.

[¶60.]     Reversed in part and remanded in part.

[¶61.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.